**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **NEW ORLEANS NAVY HOUSING, LLC, et al** | * | **CIVIL ACTION** |
| | * | **NO.  25-0363** |
| **VERSUS** | | |
| | * | **SECTION: "I" (2)** |
| **UNITED STATES DEPARTMENT OF NAVY** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**MAY IT PLEASE THE COURT:**

Defendant, the United States Department of Navy (Navy), submits this memorandum of law in support of its motion for summary judgment. Plaintiffs' Complaint asserts a cause of action under the Freedom of Information Act, 5 U.S.C. § 552 et seq, (FOIA), challenging withholdings made by Defendant in response to their subject FOIA request. R. Doc. 1. Largely, Plaintiffs are seeking to compel Defendant to produce certain documents containing the deliberative process of Defendant when reaching decisions as Non-Managing Member of New Orleans Navy Housing, L.L.C. (NONH) which owns, operates, and manages two privatized military family housing projects at the Naval Complex New Orleans, located in Orleans and Plaquemines Parishes (the Project). *Id.* Defendant, as Non-Managing Member of NONH, properly withheld the documents asserting that such documents are protected under various exemptions to FOIA, mainly Exemption 5 deliberative process.

## I.    STATEMENT OF FACTS

### A.    Processing of Plaintiffs' FOIA request

On September 7, 2023, Defendant's Naval Facilities Engineering Systems Command (NAVFAC or Agency) received a FOIA request from Plaintiffs via FOIAOnline, Defendant's online FOIA management system. *See* Exhibit A, Declaration of Atina Hall, FOIA Coordinator for Naval Facilities Engineering Systems Command Southeast. Plaintiffs' request sought the following records:

1. All documents generated since February 1, 2023 between or among Navy personnel and the Concourse Group that relate to discussions or negotiations between and among NONH, LNFH, Patrician and the Navy with respect to the cost of or funding for insurance premiums for the Project.

2. All documents generated since February 1, 2023 that discuss the development of the Navy letter dated May 30, 2023 and the transmission of that letter to LNFH dated May 30, 2023 which the Navy labelled as a "Letter of Dissatisfaction".

3. All documents generated since February 1, 2023 that discuss the reasons for Navy's decision to travel to Louisiana to review books and records of NONH in July and August 2023.

4. All documents generated since February 1, 2023 to or from Concourse Group that discuss or relate to the Navy's review of books and records of NONH in July and August 2023.

5. All documents that discuss or relate to the results or findings of the Navy review books and records of NONH in in July and August 2023.

6. All documents generated by the Concourse Group since February 1, 2023 that suggest, recommend, reference in any manner or comment on whether or not or under what terms to release funds from the Project Member Operating Reserve Account ("MORA") to cover insurance premium costs.

7. All documents that discuss the subsidy implemented through the National Defense Authorization Act ("NDAA") for 2018, pursuant to which the Navy provided certain funds to purportedly counteract the reductions to the Basic Allowance for Housing that were implemented through the NDAA for 2015, and specifically, all documents that discuss and determine that the subsidy, in whole or part, shall be deposited into the Project's MORA.

8. All documents that discuss the 2021 Property Management Incentive Fee request submitted by NONH on or about February 10, 2023, including but not limited to documents used by the Navy in the evaluation of that request and documents between the Concourse Group and the Navy that refer to or relate in any way to that request or the evaluation of that request.

9. All documents that discuss or refer to the release in 2021 of approximately $3,253,243 of funds from the Project Recapitalization Fund ("PRF") to NONH, including but not limited to any documents that relate or refer to any written terms that govern how those disbursements were to be handled or any future replenishment or repayment of any portion or all of those disbursements, which the Navy has claimed were "loans" and required a "loan repayment agreement" "within 90 days".

Ex. A-1. Upon evaluation of the FOIA request, it was determined that the Public Private Ventures (PPV) Department within the Agency – the department responsible for maintaining records related to the privatized housing project known as New Orleans Navy Housing, L.L.C. – would be the custodian of records responsive to the subject FOIA request. Ex. A.

More importantly, the requested records generally consist of materials prepared by or provided to NAVFAC Southeast PPV department in connection to the privatized military housing Project's financial and legal documents; oversight and monitoring; construction, maintenance and repair; residents interaction and satisfaction; oversight and compliance; and the Department of Defense's PPV Program management guidelines, policies, and governance. *Id.* As such, these documents are not accessible to the public. *Id.*

Accordingly, the PPV department was provided with a copy of the subject request on November 20, 2023, and was directed to conduct a search of all locations reasonably likely to contain responsive records. *Id.* Consequently, a search was conducted of electronic files, shared network folders, individual workstations, and relevant Outlook email accounts (including inbox, sent, archived, and deleted folders) of personnel reasonably expected to have responsive information. *Id.*; *see also* Exhibit B, Declaration of Tom McKelvey, Supervisory PPV Business

Agreement Manager for the Southeast NAVFAC, Asset Management, Public-Private Venture Division.

On February 15, 2024, McKelvey provided 188 documents (a total of 948 pages) responsive to Plaintiffs' FOIA request to the Agency's FOIA office. *Id.* On April 10, 2024, after the FOIA division conducted a review of the responsive records for required withholdings under the FOIA exemptions, 93 records (355 pages) were released to the requestor in full and 12 records (103 pages) were released in part. Ex. A-2. The remaining 83 responsive records (490 pages) were fully withheld under FOIA Exemptions 4, 5, and 6. Ex. A-10.

On April 18, 2024, Plaintiffs appealed the response to the Office of the General Counsel of the Department of the Navy (OGC). Ex. A-3. On April 30, 2024, the Agency submitted a response to the Deputy General Counsel of the Department of the Navy (DGC) explaining the Agency's rationale for the specific withholdings. Ex. A-4. On May 13, 2024, DGC remanded the request back to the Agency for reconsideration despite finding no error and directed the Agency to issue a final action. Ex. A-5. Thereafter, on June 12, 2024, the Agency issued a revised Resolution Notice, which explained the withholdings in more detail and provided an index of withheld documents, although no additional documents were released to the Requester. Ex. A-6.

On June 21, 2024, Plaintiffs submitted another appeal of the Agency's revised Resolution Notice to the Office of the General Counsel of the Department of the Navy challenging the response. Ex. A-7. On July 8, 2024, NAVFAC SE once again submitted a response to the DGC supporting the withholdings. Ex. A-8. Finally, on July 11, 2024, the Deputy General Counsel of the Department of the Navy issued a final denial decision of Plaintiffs' second appeal. Ex. A-9. Still not satisfied with the results, Plaintiffs filed the instant lawsuit. R. Doc. 1.

### B.    Background on the Project and Consultants

Pursuant to the Privatization Initiative[1], in 2001, LNFH and the Navy entered into an *Operating Agreement* creating a Limited Liability Company where LNFH *exclusively* holds all rights and powers of management with full authority to take all actions necessary as the managing member, and the Navy is designated as the non-managing member. *See* Ex. B. The *Real Estate Ground/Facilities Lease* dated October 1, 2001, by and between the Navy and LNFH, as amended (Ground Lease) and the *Operating Agreement* memorialized the respective roles and provide technical requirements for privatizing the housing and leasing the land where the Project stands. *Id.*

Article IV of the *Operating Agreement* entitled "Management of the Company" outlines the commitment, rights, and responsibilities of Plaintiff, LNFH, as "Managing Member." *Id.* LNFH was to "develop, construct, maintain, operate and manage the Project to a high level of skill

---

[1] In 1996 Congress enacted the Military Housing Privatization Initiative (MHPI or the Privatization Initiative) in Section 2871 of the National Defense Authorization Act (NDAA). P.L. 104-106, 110 Stat. 186. 10 U.S.C. § 2871-2885 *et seq*. The Privatization Initiative provided "alternative authorizations" to attract private sector financing, expertise, and innovation to revitalize military family housing on an accelerated basis as compared to the legacy budgetary processes. S. Rep. No. 104-112, §§ 2811 pp. 329 (1995). Under the Privatization Initiative, the private commercial entity developer "own[s], operate[s] and maintain[s] the houses, and lease[s] the underlying land from the agency for a term of fifty years." Stacie A. Remy Vest, *Military Housing Privatization Initiative: A Guidance Document for Wading Through the Legal Morass*, 53 A.F. L. Rev. 1, 24 (2002).

This initiative allowed the Navy and the other military branches to remove themselves from the distractions of day-to-day housing decisions and management and focus on their core mission of defending the United States. Ex. B. The MHPI model explicitly preserves the federal government's sovereign immunity and privileges and allows the services to retain oversight of the privatized Project to ensure that private partners meet housing standards. *Id.* The MHPI operates across all military branches and at numerous installations nationwide, including Army, Navy, Air Force, and Marine Corps bases. MHPI was originally centralized within the DoD under the Office of the Secretary of Defense (OSD). *Id.*

In 1998, OSD transferred operational responsibility for MHPI to the individual military branches, with oversight and final approval authority vested in the OSD Directorate of Housing and Competitive Sourcing. *Id.* The Deputy Assistant Secretary of Navy Installations and Facilities (DASN I&F) delegated Navy and Marine Corps PPV acquisition authority to NAVFAC. *Id.* NAVFAC is responsible for the execution and oversight of the housing partnerships (LLCs), ensuring that private partners meet performance standards. *Id.* NAVFAC reports to DoD who must regularly report to Congress on the implementation of reforms, any project performance failures and the steps taken to ensure Project's accountability and tenant safety. *Id.*

and care" for the duration of the agreement. *Id.* Section 4.02(b) of the *Operating Agreement* requires that LNFH "have exclusive management and control. . . [including] all the rights and powers of a manager.... [to do] all things which are necessary, proper or desirable to carry out . . . [the] duties and responsibilities . . ." *Id.* The *Operating Agreement* also requires LNFH to carry insurance and indemnify and/or hold Navy harmless for any claims arising out of Navy's participation as a non-managing member, Section 4.02(b)(v). *Id.*

Pursuant to the *Operating Agreement*, the Navy, as non-managing member of NONH, has the right to provide oversight on recapitalization plans, financial operations, and Project performance. *Id.* The Navy's oversight responsibilities are carried out by NAVFAC's Business Agreement Manager (BAM) and his staff of project managers, and financial analysts responsible for reviewing major account expenditures, annual budgets, fee proposals, and monitoring the performance and fiscal health of the Project LLC. *Id.* During the time relevant to this litigation, Tom McKelvey was the BAM providing oversight to the NONH Project. *Id.*

Additionally, Congress mandated enhanced oversight of privatized military housing projects as a response to widespread reports of poor living conditions and inadequate management, affecting service members and their families living in privatized base housing. *Id.* These reforms were passed largely as amendments to the MHPI act between 2019 and 2023 an aim to strengthen accountability, transparency, and tenant protections across the DoD MHPI housing, prompting reforms to increase tenant protection and accountability. *See* FY2020, 2021 and 2023 NDAA, 10 U.S.C. §§2871-2885, Senate and House Armed Services Committee directives; *see also* Ex. B. Relevant to this case, Congress mandated enhanced oversight: (1) to address the future sustainment, recapitalization, and financial condition of MHPI housing; (2) greater visibility into the financial statement of MHPI companies; (3) revised incentive fee structures so MHPI Projects

only pay Property Managers if they meet housing condition and service standards; and (3) standardized resident satisfaction survey framework. Ex. B.

Further, Congress required the Secretary of each military department to issue guidance on MHPI housing, define risk tolerance regarding the future sustainability of MHPI housing projects, and assess the significance of specific risks. *See*, Section 606(c) (3) of the NDAA FY 2019. Therefore, to execute Congress's mandate for enhanced oversight of privatized military housing, the DoD and the individual military branches have established and implemented a comprehensive set of formal policies, directives, and administrative frameworks. Ex. B. These policies operationalize the reforms required by the FY2020-FY2023 NDAA's and Congressional oversight. *Id.* NAVFAC has also issued additional oversight policies and guidance, all of which have been distributed to the private partners, including LNFH. *Id.*

Not surprisingly, due to the financial and budget complexity of the Navy's Public Private Venture Program, consultants are hired to provide subject matter expertise, input, and recommendations for the strategic direction of functions within the Navy's Public Private Venture Program. *Id.* Consultants are required to help align PPV Program initiatives to strategic plan, data, and process management. *Id.* For each project, they participate in the following: (1) assist in project development and financial proposal analysis; (2) budget and audit reviews; (3) reviews of project cash flow distribution, financial and bank statements; (3) data analysis; (4) streamlining and reporting; (4) communication support with private partners; (5) help develop standardized housing business processes; (6) provide support with data system and calibration; and (7) in drafting white papers/studies needed pursuant to the needs of each project. *Id.* Additionally, consultants are required to develop, establish, and define guidance and standard processes to implement the provisions established in MHPI statute and in the NDAA. *Id.*

The Navy's consultants on MHPI act in a capacity functionally equivalent to that of an agency employee, with no independent interest in the outcome of the deliberation and the consultant's role is solely advisory. *Id.* The Navy's consultants on MHPI operate under the direction and control of agency staff and are integrated into the deliberative workflow. Most importantly, the Navy retains full discretion over whether and how to use the consultant's input. *Id.*

At all the times relevant to events subject to this Complaint, The Concourse Group (TCG) was the Navy's consultant on MHPI matters. Ex. B. Matt Brookman was the TCG's consultant assisting McKelvey on issues related to the NONH LLC Project. *Id.* TCG provided consultative services to the Navy from 2015 through October 2023. *Id.* As a condition precedent to working on MHPI matters, each member of the TCG Team was required to execute a Non-disclosure Agreement. *Id.* Certain material responsive to Plaintiffs' FOIA request are communications, analysis, recommendations, opinions, and drafts prepared by TCG within its role as the Navy's consultant.

## II.    THE STANDARD FOR SUMMARY JUDGMENT IN A CASE UNDER THE FREEDOM OF INFORMATION ACT

The purpose of the Freedom of Information Act is "to facilitate public access to government documents." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991); *Manna v. U.S. Dep't of Justice*, 51 F.3d 1158, 1163 (3d Cir. 1995). "Congress recognized, however, that public disclosure is not always in the public interest." *CIA v. Sims*, 471 U.S. 159, 166-67 (1985); *Sheet Metal Workers Int'l Ass'n, Local Union 19 v. U.S. Dep't of Veterans Affairs*, 135 F.3d 891, 897 (3d Cir. 1998) (noting that public access to government information is not "all encompassing"). Indeed, FOIA specifically exempts nine categories of documents from its broad disclosure requirements.  5 U.S.C. § 552(b).  *See U.S. Dep't of Justice v. Reporters Comm. for Freedom of*

*the Press*, 489 U.S. 749, 755 (1989). These exemptions are designed "to balance the public's interest in governmental transparency against the 'legitimate governmental and private interests [that] could be harmed by the release of certain types of information.'" *United Techs Corp. v. U.S. Dep't of Defense*, 601 F.3d 557, 559 (D.C. Cir. 2010), *quoting Critical Mass Energy Project v. Nuclear Reg. Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992 (en banc). Courts have emphasized that the FOIA exemptions "'are intended to have meaningful reach and application' and should not 'be construed in a nonfunctional way.'" *Manna*, 51 F.3d at 1163, *quoting John Doe Agency*, 493 U.S. at 152, 157 (1989).

Summary judgment is the procedural vehicle by which nearly all FOIA cases are resolved. *Wickwire Gavin, P.C. v. U.S. Postal Service*, 356 F.3d 588, 591 (4th Cir. 2004) (citing *Miscavige v. IRS*, 2 F.3d 366, 369 (11th Cir. 1993)) ("FOIA cases are generally resolved on summary judgment once the documents at issue have been properly identified."); *accord Cooper Cameron Corp. v. U.S. Dep't of Labor*, 280 F.3d 539, 543 (5th Cir. 2002) ("Summary judgment resolves most FOIA cases."). In a FOIA case, "the burden is on the agency to sustain its action" in withholding documents under the exemptions.  5 U.S.C. § 552(a)(4)(B). *See Ray*, 502 U.S. at 173 ("[t]he strong presumption in favor of disclosure places the burden on the agency to justify the withholding of any requested documents"). The agency can sustain its burden under FOIA by submitting a detailed explanation "describing the material withheld and detailing why it fits within the claimed exemption." *McDonnell v. United States*, 4 F.3d 1227, 1241 (3d Cir. 1993).

The precise form of the agency's submission—whether it be a "*Vaughn*" index, declaration, affidavit, narrative, or combination—is immaterial, so long as the nature of the withheld information is adequately attested to by the agency.  *See Hornbeck v. U.S. Coast Guard*, No. 04-1724, 2006 WL 696053, at *6 (D.D.C. Mar. 20, 2006); *Judicial Watch, Inc. v. Food &*

*Drug, Admin.*, 449 F.3d 141, 146 (D.C. Cir. 2006) (stating that an agency may "submit other measures in combination with or in lieu of the index itself," such as supporting affidavits, or seek in camera review of the documents); *Wishart v. Comm'r,* No. 98-17248, 1999 WL 985142, at *1 (9th Cir. Oct. 27, 1999). The agency is entitled to summary judgment in a FOIA case if the agency's affidavits "describe the withheld information and the justification for withholding with reasonable specificity, demonstrating a logical connection between the information and the claimed exemption" and the agency's affidavits "are not controverted by either contrary evidence in the record or bad faith." *Manna*, 51 F.3d at 1163-64, *quoting Am. Friends Serv. Comm. v. Dep't of Defense*, 831 F.2d 441, 444 (3d Cir. 1987).

Importantly, the agency's affidavits enjoy "a presumption of good faith." *Samahon v. U.S. Dep't of Justice*, 2015 WL 857358, at *5 (E.D. Pa. Feb. 27, 2015). *See Andela v. Admin. Office of U.S. Courts*, No. 13-0865, 2014 WL 695209, at *2 (E.D. Pa. Feb. 21, 2014) ("The court should not question the veracity of the agency's submissions explaining the reason for its nondisclosure unless there is evidence of bad faith"), *aff'd*, 569 F. App'x 80 (3d Cir. 2014); *Lewis v. U.S. EPA*, No. 06-2660, 2006 WL 3227787, at *6 (E.D. Pa. Nov. 3, 2006) ("a district court must accord affidavits submitted by an agency a presumption of good faith") (citations omitted). A court may award summary judgment if the declarations provided by the agency are "adequate on their face." *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994). The district court reviews the agency's use of a FOIA exemption to withhold documents *de novo*. 5 U.S.C. § 552(a)(4)(B); *see Reporters Comm. for Freedom of the Press*, 489 U.S. at 755. The declarations submitted by Hall and McKelvey, *in globo*, are sufficient *Vaughn* indices as they describe the complete FOIA process and describe the withholdings asserted by the Navy.

10

III.     **ARGUMENT**

A.     **The standard for applying Exemption 5.**

Highlighted in Plaintiffs' administrative appeals of their FOIA request, Plaintiffs' main objection is Defendant's use of FOIA Exemption 5, the withholding of deliberative process material. *See generally* R. Doc. 1. Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Exemption 5 incorporates civil discovery privileges, including the deliberative process privilege and similar recognized "claims of privilege when confidentiality is necessary to ensure frank and open discussion and hence efficient governmental operations." *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 802 (1984); *see also Lahr v. Navy*, 569 F.3d 964, 979 (9th Cir. 2009).

Although Exemption 5 incorporates all civil discovery privileges, **there is a critical distinction between the application of those privileges in civil discovery as compared to in the FOIA context**. While in civil discovery, qualified privileges may be overcome by a showing of relevance or need by an opposing party, in the FOIA context, courts do not take into account a party's need for the documents in ruling on a privilege's applicability. *See FTC v. Grolier*, 462 U.S. 19, 27-28 (1983); *MacLean v. DOD*, No. 04-CV-2425, slip op. at 8-9 (S.D. Cal. June 6, 2005) ("[S]ince there is no 'need' determination under FOIA, there is no room for this Court to balance the public's interest in disclosure against defendants' interest in protecting the deliberative process."), *aff'd on other grounds*, 240 F. App'x 751, 754 (9th Cir. 2007). This approach prevents the FOIA from being used to circumvent civil discovery rules. *See Weber Aircraft*, 465 U.S. at 801.

The Navy invoked the deliberative process privilege when it withheld documents pursuant to FOIA Exemption 5. *See* Ex. A-10, detailed log of withheld material. The general purpose of this privilege is to "prevent injury to the quality of agency decisions." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975). Specifically, three policy purposes have been consistently held to constitute the bases for this privilege: (1) to encourage open, frank discussions on matters of policy between subordinates and superiors; (2) to protect against premature disclosure of proposed policies before they are actually adopted; and (3) to protect against public confusion that might result from disclosure of reasons and rationales that were not in fact ultimately the grounds for an agency's action. *See, e.g., Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982); *Coastal States Gas Corp. v. DOE*, 617 F.2d 854, 866 (D.C. Cir. 1980).

The privilege "covers recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Coastal States*, 617 F.2d at 866. Factual information is protected "so long as it reflect[s] an agency's preliminary positions or ruminations about how to exercise discretion on some policy matter." *Agility Pub. Warehousing Co. K.S.C. v. Dep't of Defense*, 110 F. Supp. 3d 215, 222 (D.D.C. 2015); *accord KDKA-TV v. Thornburgh*, Civil Action No. 90-1536, 1992 U.S. Dist. Lexis 22438, at *10–11 (D.D.C. Sept. 1992).

To be exempt from disclosure under the deliberative process privilege, a record must be both "pre-decisional," in that it was generated before the adoption of an agency policy, and "deliberative," in that it reflects the give-and-take of the consultative process. *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997); *Coastal States,* 617 F.2d at 866. To show that the withheld documents are predecisional, the Navy need not "identify a specific decision in connection with which a memorandum is prepared . . . [because] agencies are, and properly should be, engaged in

a continuing process of examining their policies," *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 n.18 (1975). Rather, the Navy need only establish "what deliberative process is involved, and the role played by the documents in issue in the course of that process." *Coastal States*, 617 F.2d at 868. Exemption 5 applies so long as a document is generated as part of, and contributes to, a continuing process of agency decision making. *See, e.g., Access Reports v. DOJ*, 926 F.2d 1192, 1196 (D.C. Cir. 1991. Courts have protected as deliberative material that would expose the opinions, advice, or recommendations offered in the course of agency decision-making. *See, e.g., Elec. Frontier Found. v. DOJ*, 892 F. Supp. 2d 95, 102 (D.D.C. 2012); *Elec. Frontier Found. v. DOJ*, 890 F. Supp. 2d 35, 43-48 (D.D.C. 2012).

**B.      The withheld documents reflect the Navy's deliberative process.**

As shown in their detailed log, the Navy withheld notes, summaries, analysis, draft reports, and communications pursuant to Exemption 5. *See* Ex. A-10; *see also* Ex. B. The attached index provides detailed descriptions of these documents, and how they were generated as part of, contribute to, or reflect the Navy's deliberative and decision-making process. *Id*. The responsive communications at issue were part of the agency's internal deliberative process, intended to assist decision-makers by providing subject-matter expertise and analytical input in reaching a decision in relation to: (1) the short and long-term sustainment and recapitalization of the Project; (2) LNFH's refusal to replenish the Project's Recapitalization Fund (PRF) in the amount of $3,253,243.00 after disbursements were made in 2021; (3) LNFH's request for a Member Operating Reserve Account (MORA) disbursement in the amount of $4M to cover the total sum owed by LNFH for the Project's 2023 insurance premiums; (4) LNFH's request to prioritize the distribution of the Property Manager Incentive Fee and the Asset Manager Fee to the replenishment of the Project's accounts; and (5) assisted the Navy in taking precautionary

13

measures in its oversight role and a conservative approach on the Project's financials to preserve PRF and MORA funds for future Project needs. Ex. B.

The analysis, recommendations, and opinions generated were in aid of the Navy's deliberative process not reflecting any final decision or policy. *Id.* The responsive communications and documents also reflect the preliminary views, assessments, or recommendations by TCG consultant prepared exclusively for the purpose of assisting in the Navy's internal deliberations. *Id.* These documents/communications were not publicly disclosed and were maintained as confidential within the Navy's internal review process. *Id.*

C. **The deliberative process privilege protects information submitted by non-government consultants at the Navy's request for advice.**

As discussed above, due to the financial and budget complexity of the Navy's Public Private Venture Program created under the MHPI statute, consultants are hired to provide subject matter expertise, input, and recommendations for the strategic direction of functions within the Navy's Public Private Venture Program. Ex. B. These consultants are required to help align PPV Program initiatives to strategic plan, data and process management. *Id.* For each project, they participate in the following: (1) assist in project development and financial proposal analysis; (2) budget and audit reviews; (3) reviews of  project cash flow distribution, financial and bank statements; (3) data analysis; (4) streamlining and reporting; (4) communication support with private partners; (5) help develop standardized housing business processes; (6) provide support with data system and calibration; and (7) in drafting white papers/studies needed pursuant to the needs of each project. *Id.* Additionally, consultants are required to develop, establish, and define guidance and standard processes to implement the provisions established in MHPI statute and in the NDAA. *Id.* Indeed, these consultants assist the Navy decision-making team in critical and

sensitive policy decisions. Moreover, the withheld material responsive to Plaintiffs' FOIA request fall within this partnership. *See* Ex. A-10.

Under the "consultant corollary theory," intra-agency documents can include "agency records containing comments solicited from nongovernmental parties." *McKinley v. Bd. of Governors of the Fed. Reserve Sys.*, 647 F.3d 331, 336 (D.C. Cir.2011) (citing *Nat'l Inst. of Military Justice v. DOD*, 512 F.3d 677, 680, 682 (D.C. Cir.2008)). In holding this advice covered by the Exemption, courts have emphasized that the agencies [similar to the Navy in this case] sought the outside advice, the advice was not adverse to government interests, and that in providing their expertise, the consultants effectively functioned as agency employees. S*ee, e.g., Nat'l Inst. of Military Justice v. DOD*, 512 F.3d 512 F.3d 677, 679-80 (D.C. Cir. 2008); *Nat'l Inst. of Military Justice v. DOD*, 404 F. Supp. 2d 325, 345 (D.D.C. 2005); *McKinley*, 647 F.3d at 337-38; *Electronic Privacy Information Center v. DHS*, 892 F. Supp. 2d 28, 45-46 (D.D.C. 2012); *United States v. Real Prop. Known & Numbered as 2847 Chartiers Ave. Pittsburgh, Pa.*, 142 F.R.D. 431, 434 (W.D. Pa. 1992) ("The fact that, as here, the document was prepared by an outside consultant for the agency's use, does not adversely affect its status as 'interagency.'").

The Fifth Circuit recently affirmed protection of material under the consultant corollary exemption. In *Jobe v. National Transportation Safety Board*, 1 F.4th 396, 399 (5th Cir. 2021), the Fifth Circuit affirmed that "[s]everal circuits, including [the Fifth Circuit], read Exemption 5 to protect communications not only among an agency's employees, but also with some non-agency experts who's input the agency has solicited. This is known as the 'consultant corollary.'" In *Jobe*, the Court found that Exemption 5 covered NTSB's communications with the private entities it regulates when those private parties assist in the safety investigations of their own aircraft following crashes. *Id.*

15

Here, as in *Jobe,* the advice provided to the Navy by technical representatives are intra-agency communications covered by the consultant corollary to Exemption 5. The Navy sought the outside advice, the advice was not adverse to government interests, and in providing their expertise, the consultants effectively functioned as agency employees. *See* Ex. 10-A; *Nat'l Inst. of Military Justice* 512 F.3d at 679-80; *McKinley,* 647 F.3d at 337-38, *Electronic Privacy Information Center*, 892 F. Supp. 2d at 45-46; *United States v. Real Prop. Known & Numbered as 2847 Chartiers Ave. Pittsburgh, Pa.*, 142 F.R.D. 431, 434 (W.D. Pa. 1992).

### D.      Factual information is protected by the privilege.

In the administrative appeal to the agency's supplemental production of records, Plaintiffs seem to argue that the documents the Navy has withheld pursuant to the deliberative process privilege under Exemption 5 are purely factual, and not subject to the privilege.  As an initial matter, courts have recognized the shortcoming of a factual versus deliberative distinction.  *See e.g., Dudman Commc'ns Corp. v. Dept. of the Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987). Factual information should be examined "in light of the policies and goals that underlie" the privilege and in "the context in which the materials are used." *Wolfe v. HHS*, 839 F.2d 768, 774 (D.C. Cir. 1988); *accord Ryan v. Dep't of Justice*, 617 F.2d 781, 790 (D.C. Cir. 1980) (Factual segments are protected from disclosure as not being purely factual if the manner of selecting or presenting those facts would reveal the deliberate process, or if the facts are inextricably intertwined with the policy-making process. The Supreme Court has substantially endorsed this standard.) (internal citations omitted).

As such, Exemption 5 protects as deliberative material the following, among other, records: (1) reports that constitute the interpretation of technical data, *Parke, Davis & Co. v. Califano*, 623 F.2d 1 (6th Cir. 1980); *Reliant Energy Power Generation, Inc. v. F.E.R.C.*, 520 F. Supp 2d 194,

205 (D.D.C. 2007); and (2) the selection of facts out of a larger group. *Montrose Chem. Corp. v. Train*, 491 F.2d 63 (D.C. Cir. 1974).

Defendant's *Vaughn* index describes the content of each withheld document and the rationale for withholding them. Ex. 10-A. Additionally, Defendant's declarations provide background and context about the Project and types of records that are generated in its evaluation of the Project's financial assessment and recapitalization. Exs. A and B. Through its motion, *Vaughn* index, and declarations, Defendant has fully detailed how the information contained within each document is intertwined with and reflects the agency's preliminary positions and opinions, all of which is covered by the deliberative process privilege. *Coastal States*, 617 F.2d at 866. Accordingly, the Navy's decision to withhold the documents identified in the *Vaughn* index as deliberative process privileged was proper.

### E.    The Navy also asserted secondarily FOIA Exemptions 4 and 6.

As discussed above, **all** redactions by the Navy, whether in whole or in part, were rooted exclusively in FOIA Exemption 5. Still, FOIA Exemptions 4 and 6 *could also* apply to *some* of the withheld material. These secondary exemptions were made to preserve the exemptions. However, the Court must deny Exemption 5 withholdings prior to the analysis of either FOIA Exemption 4 or 6. In other words, if the Court agrees the Navy properly withheld material under FOIA Exemption 5, that is the end of the analysis.

Nonetheless, Exemption 4 is a FOIA-related tool that permits parties to block the disclosure of "commercial or financial information" that is "obtained from a person and [is] privileged or confidential." 5 U.S.C. § 552(b)(4). In *Food Marketing Institute v. Argus Leader Media*, the Supreme Court laid out the new Exemption 4 standard: information may be exempt from a FOIA release as "confidential" if it is (1) "both customarily and actually treated as private by its owner"

and (2) "provided to the government under an assurance of privacy." 139 S. Ct. 2356, 2363–66 (2019).

In the 83 documents withheld in their entirety by Defendant, only 5 records were withheld under Exemption 4. As reflected in the *Vaughn* index (Ex. A-10) each entry utilizing Exemption 4 states that the material was either marked as "business confidential," "proprietary information" or material that "both customarily and actually treated as private by its owner" and (2) "provided to the government under an assurance of privacy." *Food Marketing Institute* at 2363–66.

Further, FOIA Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." *See* 5 U.S.C. § 552(b)(6). Here, Exemption 6 was invoked to withhold identifying information that related to individuals who did not provide consent for release. Ex. A-10. Moreover, the withheld names, email addresses, and titles are individuals involved in the deliberative process communications. Therefore, the personal information was withheld under Exemption 6 for their participation in the decision-making process withheld under Exemption 5.

## IV.   CONCLUSION

For all the reasons set forth above, Defendant respectfully requests that the Court grant its motion for summary judgment and enter judgment in its favor.

Respectfully submitted,
MICHAEL M. SIMPSON
ACTING UNITED STATES ATTORNEY

  *s/ Brock D. Dupre*
**BROCK D. DUPRE (#28563)**
Assistant United States Attorney
650 Poydras Street, Suite 1600
New Orleans, Louisiana 70130
Telephone: (504) 680-3005
Facsimile: (504) 680-3184
Brock.Dupre@usdoj.gov

18