**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **NEW ORLEANS NAVY** | * | **CIVIL ACTION NO. 2:25-cv-0363** |
| **HOUSING, LLC, et al.** | * | |
| | * | **SECTION I, DIVISION (2)** |
| **VERSUS** | * | |
| | * | **JUDGE LANCE M. AFRICK** |
| **UNITED STATES DEPARTMENT** | * | |
| **OF THE NAVY** | * | **MAG. JUDGE CURRAULT** |
| | * | |

<u>**DECLARATION OF THOMAS C. MCKELVEY**</u>

I, Thomas C. McKelvey, hereby declare under penalty of perjury:

1. I am the Supervisory Public-Private Venture ("PPV") Business Agreement Manager for the Southeast Naval Facilities Engineering Systems Command ("NAVFAC"), Asset Management, Public-Private Venture Division. I have held this position since January 2015.

2. In this capacity, I am familiar with the Department of the Navy's ("DON" and/or "the Agency") role as non-managing member of New Orleans Navy Housing, LLC ("NONH") a Louisiana Limited Liability Company formed by way of an *Operating Agreement* by and between the Department of the Navy ("DON"), Louisiana Navy Family Housing, LLC ("LNFH"), and Belle Chasse C.G. LP (the "Operating Agreement"). The creation of this public-private venture LLC in 2001 was allowed by the Military Housing Privatization Initiative codified in 10 U.S.C. § 2871-2885 *et seq*.

3. As part of my duties, I am the Officer responsible for overseeing and processing any request of records under the Freedom of Information Act ("FOIA"), 5 U.S.C. §552 in connection to DON's records of the Privatized Military Housing Projects in the Southeast Region, including the Project located in Federal City, Orleans Parish and Naval Air Station (NAS) Plaquemines Parish. I am familiar with the procedures used by the Agency in responding to requested documents made under FOIA.

4. The statements made in this declaration are based to the best of my knowledge and information available to me in my official capacity and about which I have become knowledgeable.

5. I submit this declaration in support of the Agency's Motion for Summary Judgment.

<span style="color:red">**Exhibit B**</span>

**Background on The Military Housing Privatization Initiative**

6. Congress enacted the Military Housing Privatization Initiative ("MHPI') (the "Privatization Initiative") in Section 2871 of the National Defense Authorization Act ("NDAA"). P.L. 104-106, 110 Stat. 186. 10 U.S.C. § 2871-2885 *et seq*.

7. The Privatization Initiative provided "alternative authorizations" to attract private sector financing, expertise, and innovation to revitalize military family housing on an accelerated basis as compared to the legacy budgetary processes. S. Rep. No. 104-112, §§ 2811 pp. 329 (1995).

8. Under the Privatization Initiative, the private commercial entity developer "own[s], operate[s] and maintain[s] the houses, and lease[s] the underlying land from the agency for a term of fifty years." Stacie A. Remy Vest, *Military Housing Privatization Initiative: A Guidance Document for Wading Through the Legal Morass*, 53 A.F. L. Rev. 1, 24 (2002).

9. This initiative allowed the DON and the other military branches to remove themselves from the distractions of day-to-day housing decisions and management and focus on their core mission of defending the United States.

10. The MHPI model explicitly preserves the federal government's sovereign immunity and privileges and allows the services to retain oversight of the privatized Project to ensure that private partners meet housing standards.

11. The MHPI operates across all military branches and at numerous installations nationwide, including Army, Navy, Air Force, and Marine Corps bases. MHPI was originally centralized within the DoD under the Office of the Secretary of Defense (OSD).

12. In 1998, OSD transferred operational responsibility for MHPI to the individual military branches, with oversight and final approval authority vested in the OSD Directorate of Housing and Competitive Sourcing.

13. The Deputy Assistant Secretary of Navy Installations and Facilities (DASN I&F) delegated Navy and Marine Corps PPV acquisition authority to NAVFAC.

14. NAVFAC is responsible for the execution and oversight of the housing partnerships (LLCs), ensuring that private partners meet performance standards.

15. NAVFAC reports to DoD who must regularly report to Congress on the implementation of reforms, any project performance failures and the steps taken to ensure Project's accountability and tenant safety.

**Creation of the New Orleans Navy Housing, LLC**

16. Pursuant to the Privatization Initiative, in 2001, Louisiana Navy Family Housing, LLC ("LNFH") and DON entered into an *Operating Agreement* creating a Limited Liability Company where LNFH *exclusively* holds all rights and powers of management with full authority to take all actions necessary as the managing member, and DON is designated as the non-managing member.

17. The *Real Estate Ground/Facilities Lease* dated October 1, 2001, by and between the DON and LNFH, as amended ("Ground Lease") and the *Operating Agreement* memorialized the respective roles and provide technical requirements for privatizing the housing and leasing the land where the Project stands.

18. Article IV of the *Operating Agreement* entitled "Management of the Company" outlines the commitment, rights, and responsibilities of Plaintiff, LNFH, as "Managing Member". LNFH was to "develop, construct, maintain, operate and manage the Project to a high level of skill and care" for the duration of the agreement. Section 4.02(b) of the *Operating Agreement* requires that LNFH "have exclusive management and control. . . [including] all the rights and powers of a manager.... [to do] all things which are necessary, proper or desirable to carry out . . . [the] duties and responsibilities . . ." The *Operating Agreement* also requires LNFH to carry insurance and indemnify and/or hold Navy harmless for any claims arising out of Navy's participation as a non-managing member. Section 4.02(b)(v).

19. Pursuant to the *Operating Agreement*, DON, as non-managing member of NONH, has the right to provide oversight on recapitalization plans, financial operations, and Project performance.

20. DON's oversight responsibilities are carried out by NAVFAC's Business Agreement Manager (BAM) and his staff of project managers, and financial analysts responsible for reviewing major account expenditures, annual budgets, fee proposals and monitoring the performance and fiscal health of the Project LLC.

21. During the time relevant to this claim, I was the BAM providing oversight to the NONH Project.

### **Congress Mandated Enhanced MHPI Project Oversight**

22. Congress mandated enhanced oversight of privatized military housing projects as a response to widespread reports of poor living conditions and inadequate management, affecting service members and their families living in privatized base housing.

23. These reforms were passed largely as amendments to the MHPI act between 2019 and 2023 an aim to strengthen accountability, transparency, and tenant protections across the DoD MHPI housing, prompting reforms to increase tenant protection and accountability. See FY2020, 2021 and 2023 NDAA, 10 U.S.C. §§2871-2885, Senate and House Armed Services Committee directives.

24. Relevant to this case, Congress mandated enhanced oversight: (1) to address the future sustainment, recapitalization and financial condition of MHPI housing; (2) greater visibility into the financial statement of MHPI companies; (3) revised incentive fee structures so MHPI Projects only pay Property Managers if they meet housing condition and service standards; and (3) standardized resident satisfaction survey framework.

25. Congress required the Secretary of each military department to issue guidance on MHPI housing, define risk tolerance regarding the future sustainability of MHPI housing projects, and assess the significance of specific risks. See, Section 606(c) (3) of the NDAA FY 2019.

26. To execute Congress's mandate for enhanced oversight of privatized military housing, the DoD and the individual military branches have established and implemented a comprehensive set of formal policies, directives and administrative frameworks. These policies operationalize the reforms required by the FY2020-FY2023 NDAA's and Congressional oversight. For example, DoD Instruction 4165.63-DoD Housing Policy; MHPI Business Rules and Performance Oversight Framework developed by the Office of the Secretary of Defense (OSD); NAVFAC guidance on Navy & Marine Corps PPV Oversight Policies. NAVFAC has issued additional oversight policies and guidance, all of which have been distributed to the private partners, including LNFH.

### **MHPI Consultants**

27. Due to the financial and budget complexity of the DON's Public Private Venture Program, consultants are hired to provide subject matter expertise, input and recommendations for

the strategic direction of functions within the DON's Public Private Venture Program. Consultants are required to help align PPV Program initiatives to strategic plan, data and process management. For each project, they participate in the following: (1) assist in project development and financial proposal analysis; (2) budget and audit reviews; (3) reviews of project cash flow distribution, financial and bank statements; (3) data analysis; (4) streamlining and reporting; (4) communication support with private partners; (5) help develop standardized housing business processes; (6) provide support with data system and calibration; and (7) in drafting white papers/studies needed pursuant to the needs of each project. Additionally, consultants are required to develop, establish, and define guidance and standard processes to implement the provisions established in MHPI statute and in the NDAA.

28. The DON's consultants on MHPI act in a capacity functionally equivalent to that of an agency employee, with no independent interest in the outcome of the deliberation. The consultant's role is solely advisory.

29. The DON's consultants on MHPI operate under the direction and control of agency staff and are integrated into the deliberative workflow.

30. The DON retains full discretion over whether and how to use the consultant's input.

31. At the time relevant to this Complaint, The Concourse Group ("TCG") was DON's consultant on MHPI matters. Matt Brookman was the TCG's consultant assisting me on issues related to the NONH LLC Project.

32. TCG provided consultative services to the DON from 2015 through October 2023. As a condition precedent to working on MHPI matters, each member of the TCG Team was required to execute a Non-disclosure Agreement.

33. The responsive communications at issue (between TCG and the DON) were part of the agency's internal deliberative process, intended to assist decision-makers by providing subject-matter expertise and analytical input in reaching a decision in relation to: (1) the short and long-term sustainment and recapitalization of the Project; (2) LNFH's refusal to replenish the Project's Recapitalization Fund ("PRF") in the amount of $3,253,243.00 after disbursements were made in 2021; (3) LNFH's request for a Member Operating Reserve Account ("MORA") disbursement in the amount of $4M to cover the total sum owed by LNFH for the Project's 2023 insurance premiums; (4) LNFH's request to prioritize the

distribution of the Property Manager Incentive Fee and the Asset Manager Fee to the replenishment of the Project's accounts; and (5) assisted the DON in taking precautionary measures in its oversight role and a conservative approach on the Project's financials to preserve PRF and MORA funds for future Project needs.

34. The analysis, recommendations and opinions generated by TCG were in aid of the DON's deliberative process not reflecting any final decision or policy.

35. The responsive communications and documents reflect preliminary views, assessments, or recommendations by TCG consultant prepared exclusively for the purpose of assisting in DON's internal deliberations. These documents/communications were not publicly disclosed and were maintained as confidential within the DON's internal review process.

36. Accordingly, the opinions, memoranda, draft responses and financial analysis prepared by TCG as part of the decision-making process of the DON should be protected under FOIA Exemption 5, Consultant Corollary.

**FOIA Request**

37. On November 20,2023, I received an email from Atina Hall, NAVFAC SE FOIA officer providing a copy of the FOIA request submitted by Plaintiffs which included 9 requests.

38. In response to this request, I conducted a thorough and systematic search of all locations reasonably likely to contain responsive records. This included searching electronic files, shared network folders, individual workstations and relevant Outlook email accounts (including inbox, sent, archived and deleted folders) of personnel reasonably expected to have responsive information. The search terms used were tailored to the FOIA request, and staff with subject matter knowledge were consulted to ensure comprehensive coverage.

39. I used targeted keyword searches within Microsoft Outlook and our file system, including document title and full-text search functions. I also consulted with the NAVFAC SE Project Managers working with the NONH Project to ensure no relevant record locations were overlooked.  In addition, I, as the custodian of these documents, manually reviewed key folders.

40. The search covered the period from February 1, 2023, through the present time, which encompassed the timeframe relevant to the FOIA request. PPV staff were instructed to preserve and identify all potentially responsive documents.

41. The search yielded a total of 188 documents, 83 of which were documents and email communications between employees, DON's consultants and counsel containing pre decisional memoranda, internal agency deliberations, recommendations, and drafts created to support DON decision making with regards to the NONH Project on various matters.

42. These documents and communications were never shared publicly as they are evaluations, and opinions of the employees that assist the DON in the decision-making process pertaining the NONH Project performance. These internal deliberations among agency personnel and DON's consultant predate any final agency action and reflect candid internal discussions, recommendations, and analyses.

43. I provided NAVFAC SE FOIA Officer, Atina Hall, with a copy of the 188 responsive documents.

44. I explained to Mrs. Hall and Agency counsel the nature of the documents requested by LNFH and requested that 83 of them be evaluated under FOIA Exemption 4, 5, and 6. Below is a summary of the nature of the responsive documents that fall under specific decision process as they were generated before and in service of final decisions made by the DON.

**Request 1**-The documents withheld regarding this request were email communications that contain discussion, opinions and deliberation amongst the DON's employees and TCG consultants in relation to LNFH's request for $4M loan out of the MORA account to cover the 2023 insurance premiums of the Project. This loan request was due to insufficient funds in the Project's Tax and Insurance Escrow Fund which is the responsibility of the Managing Member.

The MORA account is a Project account solely controlled by the DON for the purpose of sustainment and recapitalization of the Project. DON has discretion on how it uses the MORA account. LNFH wanted to use $4M of the MORA account to pay an operational cost in detriment of the Project's financial health. LNFH requested DON to disburse millions of dollars to pay for an operating cost overrun from an account that is destined for the sustainment and recapitalization of the Project. This request had to be evaluated by DON's employees as part of the enhanced oversight mandated by Congress.

Revealing the internal deliberation process of this loan request (discretionary decision) disrupts the decision-making process and causes a chilling effect on open and candid discussion among

DON, its consultant and attorneys. The opinions of each of DON employees, consultant and attorneys should not be made public. Specially, when the final decision was fully explained to LNFH on a letter dated October 27, 2023. A true and exact copy of the letter is attached as **Exhibit 1**.

**Request 2**- The Requestor wants access to the preliminary impressions, questions, recommendations and opinions generated before and in service of sending out a "*Letter of Dissatisfaction*" to LNFH.

On May 30, 2023, the DON sent a "*Letter of Dissatisfaction*" to LNFH stating it had breached its contractual and fiduciary duties as Managing Member of NONH as it failed to provide an Annual Budget estimating realistic revenues, projections and operating expenses (specifically, insurance premiums); failed to ensure operating costs in the Annual Budget be paid from revenues; and failed to make appropriate adjustments to the following years Annual Budget. It further stated that the Managing Member had breached the *Operating Agreement* as it failed to provide books and records of all accounts for inspection and full access to the Project's General Ledgers accounts. The rationale for issuing the *Letter of Dissatisfaction* was fully disclosed to LNFH. A true and exact copy of the Letter of Dissatisfaction is attached as **Exhibit 2**.

DON's concerns were furthered expressed to LNFH via a letter dated June 12, 2023. In this letter DON restated its contractual right to receive the Project's financial records to better understand why the accounts were underfunded and insufficient to cover the Project's operational costs. A true and exact copy of the June 12, 2023, letter is attached as **Exhibit 3.**

**Request 3**- Responsive documents were the same as for Request 2.

**Request 4**- Responsive documents protected were the same as for Request 2 and 3.

**Request 5**- All responsive documents were released. The "results or findings of the review of the Project's books and records" were discussed in person with the representatives of LNFH while on site and were later shared in a conference call with LNFH's representatives and employees.

**Request 6**- Responsive documents protected were the same as for Request 2 and 3.

**Request 7**- All responsive documents related to the "Implementation Guidance on the "subsidy implemented through the National Defense Authorization Act ("NDAA") for 2018" were released.  As Managing Member of NONH, the LNFH already had these documents.

**Request 8**- All responsive documents that provided factual matters relevant to the validation and endorsement of the 2021 Property Management Incentive Fee submitted by the LNFH were released. Full or partial redactions were made to documents that included DON's internal discussions and approval hierarchy (names and positions) of the *Letter of Consent* executed by NAVFAC Atlantic Commander. Should disclosure be required it would cause a foreseeable harm to the Agency and will disrupt the decision-making process. No public interest nor benefit exist in learning the names and positions of the approval hierarchy of the Project Manager Incentive fee.

**Request 9**-All responsive documents that provide factual matters relevant to the "release in 2021 of approximately $3,253,243 of funds from the Project Recapitalization Fund ("PRF") to NONH" were released. Partial redactions were made of communications that include the opinions, recommendations and preliminary impressions of DON's employees and its TCG consultant which predated the decision of disbursing the funds.

45. The search of responsive documents was conducted in good faith and was reasonably calculated to locate all documents that may be responsive to the FOIA request.

46. Based on the information available and the steps taken, I believe that the Agency's search for responsive documents were consistent with the Agency's obligations under FOIA, and this declaration is submitted in support of the Agency's motion for summary judgment.

Pursuant to 28 U.S.C. §1746, I declare that the foregoing is true and correct to the best of my knowledge and belief.

**Executed on this 3rd day of June of 2025**.

*Thomas C McKelvey*

Thomas C. McKelvey
Supervisory PPV Business Agreement Manager
Southeast Naval Facilities Engineering Systems Command (SE NAVFAC)



**DEPARTMENT OF THE NAVY**
NAVAL FACILITIES ENGINEERING SYSTEMS COMMAND SOUTHEAST
JACKSONVILLE, FL 32212-0030

11101
Ser PPV/00916
October 27, 2023

Mr. David R. Johnson
Vinson & Elkins
2200 Pennsylvania Avenue NW, Suite 500 West
Washington, DC 20037-1701

Dear Mr. Johnson

**Subj:  New Orleans Navy Housing, L.L.C. and Louisiana Navy Family Housing, L.L.C.**

I am in receipt of your letter dated August 31, 2023, in which you allege that the Department of Navy Member ("DON") breached the covenant of good faith and fair dealing that stems from the *Operating Agreement of New Orleans Navy Housing, LLC* (hereinafter, the "OA"), entered into by the DON, Louisiana Navy Family Housing, LLC ("LNFH"), and Belle Chasse C.G. LP as amended and restated on January 17, 2012. You claim that DON:  1) arbitrarily reduced rental income to the Project; (2) diverted funds intended for rental income to other activities and to the Member Operating Reserve Account ("MORA"); (3) arbitrarily refused to release MORA funds to help pay for insurance premiums; and also (4) failed to release funds to pay for general improvements from the Project Recapitalization Fund ("PRF").

Assuming, for argument's sake, that the facts stated in your letter are true, they must be evaluated in conjunction with the applicable statutes, regulations, and policies issued with respect to the Military Housing Privatization Initiative ("MPHI"), the business agreements executed in connection with the Project and the agreements reached by the members of New Orleans Navy Housing, LLC ("NONH"). The specific agreements relevant to your allegations include, but are not limited to, the following: the *Real Estate Ground/Facilities Lease* dated October 1, 2001, by and between the DON and LNFH, as amended; the *Trust Indenture and Security Agreement* dated January 17, 2012, by and between NONH and Wilmington Trust National Association ("Indenture"); the *Asset Management Agreement* dated October 1, 2001, by and between NONH and Patrician Asset Management Company, LLC as amended; the *Property Management Agreement* as amended and restated on January 17, 2012, by and between NONH and Patrician Management, Inc.; and the National Defense Authorization Act ("NDAA") as amended and the policies and guidance issued thereto.

Having considered your allegations in the context of the terms and parameters set out in these references, I offer the DON's responses below.

**I.  DON did not arbitrarily reduce rental income to the Project and divert funds intended for rental income to other activities.**

<span style="color:red">**Exhibit B-1**</span>

Congress delegated authority on the Department of Defense ("DoD") to prescribe the rates of the service member's basic allowance for housing ("BAH") in the United States. 37 U.S.C. §403 (b).

DoD controls all matters related to the determination of BAH rates since it is meant to cover a portion of the service member's housing rental and utilities costs. DON does not determine BAH rates.

Beginning in 2015, DoD reduced BAH rates pursuant to congressional authority[1] and requirements. These regulatory changes did not affect the terms of the business agreements executed in connection to the Project since the specific method of calculating BAH was not addressed in the business agreements other than to recognize that rent is capped at BAH.

At execution of the business agreements, the parties agreed DON would not: (1) be responsible for making tenant rent payments; (2) guarantee tenant occupancy; or (3) be obligated to reimburse NONH or any other entity for any costs and expenses associated with ownership, operation, and management of rental units. However, the parties specifically agreed to cap tenant rent at BAH with an acknowledgement that BAH and tenant's pay grade would/could change annually. Both parties understood that BAH was an unknown and the business agreements did not limit the method of BAH calculation to market conditions. There was no contractual duty for DON to guarantee a specific method for calculating BAH. Fully aware of the contract terms and conditions, your clients agreed to provide adequate housing to service members in a priority preferred system.

Under the plain terms of the business agreements, DON has no duty to guarantee your client's expected revenues for the Project. Your allegations appear to be based on an impermissible expansion of DON's contractual duties beyond the terms set out in the business agreements or those permissible by its statutory authority.

## II. DON did not "divert" Section 606 funds to the MORA.

Pub. L. No. 115-232 (2018) ("NDAA FY 2019") first authorized Section 606 funds. Directive regarding eligibility, use and distribution of Section 606 funds was later provided to the DoD and its military departments through amendments to the NDAA. *See Sections 3036 and 3037 of Pub. L. No. 116-92 (2020)[2]; Section 2813 of Pub. L. No. 116-283 (2021), and Section 2811 of Pub. L. No. 117-81*.

To address the future sustainment, recapitalization and financial condition of MHPI housing, Congress required the Secretary of each military department to issue guidance on MHPI housing, define risk tolerance regarding the future sustainability of MHPI housing projects, and assess the significance of specific risks. See, Section 606(c) (3) of the NDAA FY 2019.

In compliance with this congressional mandate, DON issued additional clarification and guidance on the distribution of Section 606 funds which were provided to your clients. Between the clarification and guidance provided and explicitly acknowledged by your clients, in writing, was the *Implementation Guidance of Section 606*, dated April 20, 2022. This guidance covers the recent modifications of authority Congress made to the use of Section 606 funds which are available to projects identified as underfunded by the military departments and approved by the Chief Housing Officer (CHO) each year. If a project is not determined to be underfunded, it is not eligible for additional payments for underfunded projects. See, Section 3036 of NDAA FY 20.

Through this guidance, your clients were made aware and agreed that these additional payments (Section 606(a) (2) funds) are exempt from any fees or any cash waterfall distributions, notwithstanding anything to the contrary in the Project's business agreements. Further, they were informed that upon receipt, Section 606(a) (2) funds must be deposited in the Project's MORA and must be used expressly for the purpose of future sustainment, recapitalization and financial sustainability of the Project.

---

[1] Pub. L. No. 113-291-Dec 19, 2014, Section 604; Pub. L. No. 116-92-Dec 20, 2019, Section 605.
[2] To be referred to as "NDAA FY 20".

Contrary to what you appear to conclude in your letter, Section 606(a) (2) funds are not meant to increase the Project's revenues. These funds are to be expressly used in securing the future sustainment and recapitalization of underfunded projects through the funding of the MORA account which is controlled by the DON. Therefore, DON's actions are legally sound and justified.

**III.  DON is not contractually required to pay Operating Cost Overruns with MORA Funds.**

At execution of the business agreements, all parties agreed that all amounts to be distributed to the DON, as Member of NONH, were to be deposited into the MORA pursuant to Section 5.01(b) of the OA. They further agreed that the funds maintained in MORA were to be used at DON's sole discretion. Apart from LNFH's right to use limited sums from the MORA for certain nominal unpaid damages to units, the DON has full control and discretion of the MORA funds. Section 5.01(b) states as follows:

> "b) Member Operating Reserve Account. The Managing Member shall establish and maintain, during the term of the Company, a separate interest bearing account for the sole benefit of the Member, known as the "Member Operating Reserve Account" (the "MORA") at a national bank or other financial institution approved by the Member. Funds on deposit in the MORA shall not be commingled with any other funds of the Company. The Managing Member shall deposit into the MORA, at least on a monthly basis, all amounts to be distributed to the Member pursuant to Section 5.03(b) of this Agreement. The Managing Member may withdraw funds on deposit in the MORA to pay to the Company up to $250 per unit for unpaid damages above normal change of occupancy costs in units formerly occupied by military tenants. Any other withdrawal of funds from the MORA may only occur upon the written approval and direction of the Member. Upon termination of the Company and repayment in full of the Project Debt, all funds remaining in the MORA, including earnings thereon, shall belong to the Member."

As opposed to what you conclude in your letter, the DON is not required under the business agreements to use the funds deposited in the MORA account to pay for operating cost overruns (insurance premium payment). Rather, Section 3.06 of the OA specifically governs Operating Cost Overruns.  The purpose of the MORA and the duty to release any sums are two different things. Therefore, any disbursement of sums from the MORA can be conditioned by the DON to maintain fiscal responsibility of the Project.

**IV.  DON was neither responsible nor authorized to repair Hurricane Damage.**

In contrast to what you state in your letter, under the business agreements, the DON has no contractual obligation to participate in the rebuilding and repair of the Project nor to hire the contractors who would do the work. This is the exclusive responsibility of the Managing Member as well as of the Project's Property and Asset Managers. *See Section 4.02 of the OA, Sections 2.4 and 2.6 of the Property Management Agreement and Section 1.2(f) of the Asset Management Agreement.*

Asserting that the DON was negligent for not assisting in the rebuilding of the leased premises is a demand for action that exceeds the DON's defined obligations under the business agreements and its statutory authority.

**V.  The Project's Budget and Insurance Premium Payments are not DON's responsibility under the business agreements.**

For various years, the Tax and Insurance Escrow Fund of the Project has been undercapitalized, mainly due to your client's failure to accurately forecast controllable and non-controllable operating costs and expenses. More specifically, your clients have continuously overestimated controllable expenses and costs while under-budgeting insurance and capital repair and replacement costs. Operational Budget deficiencies and slow-pace action to cut nonessential expenses caused the Project's capital shortages.

Pursuant to the business agreements, it is your client's responsibility to prepare a projected Operating Budget in which the Project's capital expenses, tax and insurance payments and casualty repairs are estimated for the upcoming Fiscal Year. It is a contractual requirement that the proposed estimates be compared to actual expenses of prior years. *See Section 4.18 of the Indenture and Section 4.02 of the OA*. Although the DON has provided constant recommendations and ideas to avert budget deficiencies, your clients continuously struggle with their financial budgeting and execution obligations.

For example, your clients did not voluntarily inform the DON that the Project entered into a Trap Event[3] as of December 2022.  As of March 2023, the Project remained in a Trap Event as your clients reported to the Trustee their DSCR at 1.16. During the continuance of a Trap Event, 60% of excess funds go into a Trap Term Fund. Since December 2022, there have been no excess funds to transfer to the Trap Term Fund. Had the NAVFAC PPV Project Manager not continued asking for this information, DON would have remained unaware of it.

In 2022, your clients opted unilaterally to finance the insurance premium owed by the Project, informing the DON only after the decision was made. In 2023, after recognizing that the shortage in the Tax and Insurance Escrow Fund was a recurring problem and that insurance premiums increased significantly, your clients demanded immediate action from the DON in the form of a MORA disbursement to cover the total sum owed for insurance premiums[4]. Your client further demanded DON disburse these sums before the terms and conditions of its repayment were defined and put into writing. The DON did not fulfill this demand. One of the primary reasons for non-fulfillment is that your clients never executed the legal documents needed to provide for the repayment of PRF disbursements made in 2021 in the amount of $3,253,243.00.

In 2021, the Managing Member and the DON agreed that disbursement of PRF sums was conditioned on the replenishment of the PRF. Both parties understood that replenishment could be obtained either by executing a revised business agreement that would allow the re-ordering of the cash flow waterfall priorities which would apply to the Project's gross operating revenue or any other repayment agreement proposed by your client and acceptable to the DON. In good faith, DON approved disbursement of PRF's amounts before the terms and conditions of its repayment were defined and put into writing. Notwithstanding receipt of the funds, your clients desisted from executing the legal documents needed to allow the replenishment of PRF.

In light of the aforementioned unexecuted PRF repayment agreement, the propensity for severe storms in the Project's geographical area, and the relatively low balance of the funds available in the PRF and MORA, the DON is concerned with the short and long-term sustainment and recapitalization of the Project and thus, has taken a conservative approach intended to preserve PRF and MORA funds for future Project needs. The DON has also taken precautionary measures in their Project oversight role. Some of these measures include the following: on-site inspection and audit of the General Ledger, audited financials and income statements and examining the Project's income, expenses and overall

---

[3] Exhibit A of the Indenture provides the definition of the term *Trap Event*. "*Trap Event* means that the Debt Service Coverage Ratio at any time during the prior six months shall have been less than 1.25."

[4] Section 4.02(b)(v) of the OA states that payment of insurance premiums are the responsibility of the Managing Member.

cash flow.

As explained, the DON's obligation under the business agreements is not to provide a safety net to the Managing Member when it fails to accurately budget its operational expenses. Operating cost overruns are the sole responsibility of the Managing Member per Section 3.06(a) of the OA. Accordingly, approval for a MORA disbursement is conditioned to the replenishment of the funds that can be achieved if the business agreements are amended and/or if the DON agrees to any other repayment agreement proposed by your clients. Currently, the business agreements do not allow for repayment of MORA disbursements.

DON's request for amendments to the business agreements is guided by the statutory mandate that requires a long-range plan to consistently address the future sustainment, recapitalization, and financial condition of MHPI housing. This is the standard of care required by the statutes and regulations that govern the MHPI initiative. Therefore, DON's proposed changes to the business agreements are reasonable and prudent and not arbitrary or capricious as your letter states. In conclusion, DON has not unreasonably refused to release MORA funds but rather is upholding the mission for a sustained and sufficiently capitalized Project.

## VI. The distribution of the Property Manager Incentive Fee and the Asset Manager Fee is subordinate to the distribution priority established in the Indenture.

The Property Manager Incentive Fee and the Asset Manager Fee distribution is subordinate to the distribution priority established in the business agreements, more specifically, the Indenture. This was disclosed by NONH to the Property and the Asset Manager at execution of their service contracts. *See Section 2.2 of the Asset Management Agreement ("AMA") and Section 12.2 of the Property Management Agreement ("PMA") between NONH and the service providers*. The calculation of these fees arises out of the OA, the AMA and the PMA. *See Section 5.02 of the OA, Section 2.1 of the AMA and Section 5.2(b) of the PMA*.

The Property and Asset Managers were fully aware that their fees, incentive or otherwise, were conditioned to meeting specific goals and subject to the distribution priority set out in the Indenture. *See Sections 2.1 and 2.2 of the AMA and Sections 5.2(b) and 12.2 of the PMA*. According to the plain language of the Indenture, payment of incentive fees will be made <u>after</u> essential funds and accounts are capitalized, such as the Operations and Maintenance Fund and the Tax and Insurance Fund. Even the amounts expended for restoration of the leased premises affected by a casualty are in a higher payment priority than the Property Manager Incentive Fees and the Asset Management Fees. *See Section 5.03 of the Indenture.* This is because all expenses that concern sustainment, recapitalization and financing of the Project will supersede any Property Management Incentive Fees or Asset Management Fees to be paid to service providers.

In light of the above, the DON is not acting "contrary to the provisions that require the NONH to pay incentive fees and asset management fees" when prioritizing capitalization of essential funds and accounts. All to the contrary, DON is abiding by the strict language of all of the contracts that have been executed in connection with the Project.

## VII. The DON is not responsible for the Managing Partner's over expenditure of the CRR fund.

The CRR is, and has been continuously underfunded over the past five plus years due to a lack of accuracy in the budgeting process. The DON is extremely concerned about your client's inability to accurately budget the Project's controllable and non-controllable expenses which continue to impact DON's oversight role and its right to approve planned projects and expenses through the annual

operating budget process before the CRR expenses are actually incurred.

If CRR is properly budgeted at the time of annual operating budget review and approval, a request for a PRF disbursement should not be required. However, from time to time, unexpected requirements may create a need to increase CRR. If PRF funds are needed to cover CRR type work, request for PRF funds should be made prior to the commencement of any work in the Project. The request should include estimated costs, contractor bids, age and prior maintenance of the asset, among others.   Although the DON has explained the process to your clients many times, they persist in submitting disbursement requests for PRF after the materials have been purchased and the work has been completed.

In August 2023, the DON expressed willingness to consider a disbursement of PRF funds for the present-day repairs and replacement work that is being conducted at the Project geared toward bringing additional units online. Accordingly, the disbursement of $188,000 was processed for approval. At no time did the DON agree to reimburse costs and expenses incurred in the past by the Project which were not submitted through the required process.

As expressed previously, the DON operates under a statutory mandate, which requires that it define risk tolerance regarding the future sustainability of MHPI housing projects, assess the significance of specific risks, and assure accountability of the entities that own, operate, manage and are otherwise responsible for a housing unit. If we forgo our rights to provide financial oversight and assess the sustainability of the Project, we would violate a congressional mandate.

## VIII.   Conclusion

Given all of the above, the issues that require both parties' immediate attention are (1) execution of a realistic operating budget, (2) payment of essential operating expenses such as the Project's insurance, utilities, and security and fire protection; (3) reduction of non-essential expenses and costs; and (4) replenishment of the accounts that have been adversely impacted by budget deficiencies.

Finally, the DON restates its previously expressed opposition to your representation of both the Managing Member and the Project in a potential claim against the Member from the Managing Member due to apparent conflicts of interest.

If you should want to discuss the above responses further, do not hesitate to contact me at your earliest convenience. The DON wants to work in tandem with your clients to secure short and long term financial sustainability of the Project.

Sincerely,

*Thomas C. McKelvey*

T. C. MCKELVEY
Business Agreement Manager

Copy to:
NAVFAC Headquarters (AM)
NAVFAC Atlantic (AM)
CNRSE (N9)



**DEPARTMENT OF THE NAVY**
NAVAL FACILITIES ENGINEERING SYSTEMS COMMAND SOUTHEAST
JACKSONVILLE, FL 32212-0030

11101
Ser AM5/00438
May 30, 2023

Mr. Alexis V. Lewis
Louisiana Navy Family Housing, LLC, Managing Member
New Orleans Navy Housing, LLC
8027 Jefferson Hwy.
Baton Rouge, LA 70809-7651

Dear Mr. Lewis:

Subj: **LETTER OF DISSATISFICATION**

As a Member of New Orleans Navy Housing, LLC ("**NONH**"), the United States of America acting through and represented by the Department of the Navy (hereinafter the "Government") hereto provides formal notice to you, as Manager and Agent of Louisiana Navy Family Housing, LLC ("**LNFH**"), Managing Member of NONH, of this letter, noting our dissatisfaction of LNFH's execution of its contractual and fiduciary duties as Managing Member of NONH under the *Amended and Restated Operating Agreement of New Orleans Navy Housing, LLC* dated January 17, 2012, as amended (hereinafter the "**Operating Agreement**").

This letter does not constitute a written notice to cure pursuant to **Section 6.01(a)(iii)** of the *Operating Agreement* requiring thirty (30) days to cure. Rather, this is a letter which formally expresses the Government's deep concern regarding LNFH's compliance with its obligations in the Operating Agreement, the Ground Lease and the Indenture documents. As such, the Government is hereby requesting formal action to resolve these issues within the time provided herein.

Specifically, LNFH must ensure compliance with the following provisions of the Operating Agreement:

- **Section 4.02(b)(v)**. Specifically, LNFH has failed to provide copies of all insurance renewals and failed to receive written consent of the Member upon a significant change in coverage.
- **Section 4.02(b)(xi)**. The Managing Member has not caused to be prepared and delivered timely accurate reports.
- **Section 4.02(l)**. The Managing Member has failed to provide an Annual Budget that estimates realistic projections of revenue and all operating expenses (specifically, insurance premiums). Further, the Managing Member has failed to ensure that operating costs that exceed those set forth in the Annual Budget be paid from revenues and to recommend appropriate adjustments to the following year's Annual Budget as stipulated in **Section 3.06(a)**.
- **Section 7.02**. The Managing Member has not provided all books and records of all accounts of the Company to include full access to all General Ledger accounts.

**Exhibit B-2**

- Failure to comply with the terms of the Project Recapitalization Fund ("**PRF**") disbursements dated 11 Feb 2021 and 3 Nov 2021, which stipulated disbursements are characterized as loans and a loan repayment agreement was to be established within 90 days.

Please provide any and all documents that attest that LNFH has complied with its obligations and fiduciary duties under the referenced agreements by 15 days of receipt of this letter.

If you should have any questions regarding the above, do not hesitate to contact me or Danielle Melanson, PPV Project Manager at (504) 544-2205; danielle.m.melanson.civ@us.navy.mil.

Sincerely,

T. C. MCKELVEY
Business Agreement Manager

Copy to:
NAVFAC Headquarters (AM)
NAVFAC Atlantic (AM)
CNRSE (N9)

2



**DEPARTMENT OF THE NAVY**
NAVAL FACILITIES ENGINEERING SYSTEMS COMMAND SOUTHEAST
JACKSONVILLE, FL 32212-0030

11101
Ser PPV/00461
June 12, 2023

Mr. Lewis
Louisiana Navy Family Housing, LLC, Managing Member
New Orleans Navy Housing, LLC
8027 Jefferson Hwy.
Baton Rouge, LA 70809-7651

Dear Mr. Lewis

Thank you for your response dated June 1, 2023. The Department of the Navy Member (DoN Member) is in disagreement with regard to many of the facts referenced in your letter, particularly regarding DoN Member notifications and oversight responsibilities. This letter reiterates the DoN Member's primary concerns which include receiving financial information necessary for complete understanding of the project's financial situation and the requirements for previous loans and the potential use of reserve funds for operating expenses.

As previously discussed, it is not clear to us how the Tax & Escrow Account has been substantially underfunded for the past years. This situation is the cause of concern about the Managing Member's ability to develop and execute a realistic operating budget capable to fund the operations, the Tax & Escrow Account, debt service, and reserve accounts.

Although, as you state in your letter, the Managing Member has been providing monthly financial reports, the reporting, however, is missing the General Ledger information that would provide the DoN Member with a better understanding of the project's financials and would allow for proper financial oversight. As you and your staff are aware, the DoN Member has routinely requested this information in keeping with Section 7.01 of the *Operating Agreement* which states, in pertinent part: "The Managing Member also shall provide to the Member, quarterly financial statements, and other information related to the financial performance and operation of the Project as the Member may reasonably request".

Accordingly, we request that a copy of the General Ledger be included in the Managing Member's monthly financial reporting as well as General Ledger information from 2020 to present to assist our financial understanding of our current situation.

In the event the DoN Member may be agreeable to a Member Operating Reserve Account (MORA) loan, the total amount should be minimized in order to preserve a balance to cover the $4M deductible in the event of a hurricane or other significant weather event. The following would need to take place before a MORA loan is considered: 2023 Annual Operating Budget execution, business agreements amended to allow for expeditious repayment of previous Project Recapitalization Funds (PRF) loans and potential MORA loans, available funds within the project shall be considered first to cover necessary operating expenses, 2022 trust account waterfall reconciliation completed. All of these actions need to be completed to ensure the project has available funds to meet potential deductible requirements and to provide for future capital repairs.

The DoN Member will continue to work with you and your team at Patrician to develop a realistic budget and amend the business agreements accordingly.

**Exhibit B-3**

If you should have any questions regarding the above, do not hesitate to contact me or Danielle Melanson, PPV Project Manager at (504) 544-2205; danielle.m.melanson.civ@us.navy.mil.

Sincerely,

T. C. MCKELVEY
Business Agreement Manager

Copy to:
NAVFAC Headquarters (AM)
NAVFAC Atlantic (AM)
CNRSE (N9)