## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**NEW ORLEANS NAVY
HOUSING, LLC, ET AL.**                                    **CIVIL ACTION**

**VERSUS**                                                         **No. 25-363**

**UNITED STATES
DEPARTMENT OF NAVY**                                  **SECTION I**

### ORDER AND REASONS

This case arises out of a Freedom of Information Act, 5 U.S.C. § 552, *et seq.* ("FOIA") request made by plaintiffs New Orleans Navy Housing, LLC ("NONH") and Louisiana Navy Family Housing, LLC ("LNFH") (collectively, "plaintiffs").[1] Plaintiffs challenge defendant United States Department of Navy's (the "Navy" or "DON") withholding of certain records responsive to their FOIA request.[2]

Before the Court is the Navy's motion[3] for summary judgment, which asks the Court to determine as a matter of law that the documents withheld are protected from disclosure pursuant to certain exemptions to FOIA, *see* 5 U.S.C. § 552(b). Plaintiffs filed a response[4] in opposition. The Navy filed a reply.[5]

---

[1] *See generally* R. Doc. No. 1.
[2] *See id.*
[3] R. Doc. No. 20.
[4] R. Doc. No. 21.
[5] R. Doc. No. 23.

# I.     BACKGROUND

## a.     Military Housing Privatization Initiative

To understand plaintiffs' FOIA request, it is necessary to understand the parties' relationship and responsibilities to one another.  In 2001, the Navy and LNFH formed a limited liability company, plaintiff NONH, as a public-private venture ("PPV") pursuant to the Military Housing Privatization Initiative ("MHPI").[6] The purpose of NONH was "to design, finance, construct, renovate, own, manage, acquire, lease, operate and maintain" a Navy housing project (the "project").[7] The respective roles and responsibilities of LNFH, as managing member, and the Navy, as non-managing member, are memorialized in the Real Estate Ground/Facilities Lease and the Operating Agreement ("OA") that formed NONH.[8] In general, LNFH is tasked with operations and management of the project while the Navy maintains the "right to provide oversight on recapitalization plans, financial operations, and Project performance."[9]

---

[6] *See* R. Doc. No. 20-3, at 1; R. Doc. No. 21-1, at 6. Congress enacted the MHPI to address military family housing inadequacies by providing the military branches with "alternative authorities" to engage private sector financing, expertise and innovation. *See generally* 10 U.S.C. § 2871–2885; *see also Military Housing Privatization Initiative: A Guidance Document for Wading Through the Legal Morass*, 53 A.F. L. Rev. 1, 9 (2002) ("These [MHPI granted] authorities provide flexibility in structuring agreements with private developers to provide acceptable housing for service members.").

[7] R. Doc. No. 23-3, at 13.

[8] R. Doc. No. 20-3, at 3; R. Doc. No. 21-1, at 10. The Court notes that the record includes a copy of the operative operating agreement, *see* R. Doc. No. 21-3 (Amended and Restated Operating Agreement), but not the Real Estate Ground/Facilities Lease. References made to the "operating agreement" refer to the operative version of the operating agreement, R. Doc. No. 21-3.

[9] R. Doc. No. 21-1, at ¶ 34.

Pursuant to the OA, the Navy maintains approval rights over fund disbursements made to LNFH from the project's Project Recapitalization Fund ("PRF") and Member Operating Reserve Account ("MORA").[10] The OA also requires that LNFH receive written consent from the Navy before paying the project manager, Patrician Management, LLC,[11] its annual Property Management Incentive Fee.[12] In addition, the OA gives the Navy the right to inspect the books and records of NONH, which were maintained at LNFH's principal office, at any reasonable time.[13]

Along with the OA, the Navy's role in the project is periodically shaped by Congress. For example, Congress has repeatedly passed legislation that requires increased military branch oversight of MHPI projects.[14] *See also* ANDREW TILGHMAN,

---

[10] R. Doc. No. 21-3, at 25.

[11] R. Doc. No. 21-2, at 1.

[12] *See* R. Doc. No. 21-3, at 26 ("The Company shall pay to the Manager, on an annual basis, an incentive fee (the 'Property Management Incentive Fee') . . . ."); *see also id.* at 23 ("[LNFH] shall obtain the written Consent of the [Navy] concerning any of the following [NONH] matters: . . . Determining the annual incentive fee payment that Manager is eligible to receive . . . . The Incentive Fee request and supporting documentation/data to substantiate the Incentive Fee Criteria is due to the Member on or before 10 January. As long as the Incentive Fee request is received no later than 20 January and there is no ongoing discussion/dispute, the Incentive Fee will be considered approved, subject to adjustment based on Annual Audit, once the Annual Audit from the Company is received by Member, if the Member has failed to approve the Incentive Fee by that time.").

[13] *See id.* at 32; *see also* R. Doc. No. 21-1, at ¶ 22.

[14] James M. Inhofe National Defense Authorization Act for Fiscal Year 2023, Pub. L. No. 117-263, §§ 2821–2825, 136 Stat. 2395, 2999–3001 (2022); National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92, §3016, 133 Stat. 1198, 1927–28 (2019); John S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232, § 606, 132 Stat. 1636, 1795-96 (2018); *see also* 10 U.S.C. § 2884(c) (requiring the Secretary of Defense to report semiannually information about financial health and performance of the project and the backlog of maintenance and repair).

CONG. RSCH. SERV., R48137, PRIVATIZED MILITARY HOUSING: COSTS AND BUDGETARY ISSUES FOR CONGRESS 3 (2024) ("The military departments (i.e., the Departments of the Army, Navy, and Air Force) have responsibility to administer privatized housing projects, including conducting financial management and monitoring their portfolio of projects." (citing 10 U.S.C. § 2851a)). As is relevant to one portion of plaintiffs' FOIA request, Congress has authorized additional annual payments to be made to MHPI projects to offset revenue diminished by reductions to the Basic Allowance for Housing for servicemembers.[15] *See, e.g.*, National Defense Authorization Act, 2018, PL 115-91, December 12, 2017, 131 Stat 1283. The parties do not dispute that Congress plays a role in sculpting the Navy's obligations to the project.[16]

The Navy's oversight responsibilities are carried out by the Naval Facilities Engineering Systems Command ("NAVFAC") Business Agreement Manager ("BAM").[17] At all relevant times, Tom McKelvey was the BAM providing oversight to the NONH project.[18]

---

[15] For background see Appendix A to ANDREW TILGHMAN, CONG. RSCH. SERV., R47728, MILITARY HOUSING 25 (2023).

[16] *See* R. Doc. No. 21-1, at ¶¶ 37–42.

[17] R. Doc. No. 20-3, at 2 ("NAVFAC is responsible for the execution and oversight of the housing partnerships (LLCs), ensuring that private partners meet performance standards."); *id.* at 3 ("DON's oversight responsibilities are carried out by NAVFAC's Business Agreement Manager (BAM) and his staff of project managers, and financial analysts responsible for reviewing major account expenditures, annual budgets, fee proposals and monitoring the performance and fiscal health of the Project LLC.").

[18] R. Doc. No. 21-1, at ¶ 36.

From time to time, the Navy will hire consultants to assist and advise it with respect to the Navy's oversight of the project.[19] These consultants typically supply subject matter expertise, input, and recommendations, but, the parties agree that the Navy "retains full discretion over whether and how to use the consultant's input."[20] The Concourse Group ("TCG") was the Navy's consultant on MHPI-related matters, including all matters concerning NONH with respect to plaintiffs' FOIA request.[21]

### b. Plaintiffs' FOIA Request and Administrative Procedural History

In 2020 and 2021, the housing project suffered hurricane damage.[22] To cover needed repairs, the Navy authorized LNFH to withdraw $3,253,243 million from the PRF in 2021.[23] The Navy characterizes this disbursement as a loan,[24] but LNFH "disputes that any such repayment agreement existed."[25]

Shortly after, faced with additional hurricane-related repairs and increased insurance premiums, LNFH sought the Navy's approval for an additional $4 million disbursement, this time to be drawn from the MORA.[26] The Navy denied the

---

[19] *Id.* at ¶¶ 22, 44; *see also* R. Doc. No. 20-3, at 4–5 ("For each project, [the consultants] participate in the following: (1) assist in project development and financial proposal analysis; (2) budget and audit reviews; (3) reviews of project cash flow distribution, financial and bank statements; (3) data analysis; (4) streamlining and reporting; (4) communication support with private partners; (5) help develop standardized housing business processes; (6) provide support with data system and calibration; and (7) in drafting white papers/studies needed pursuant to the needs of each project.").

[20] R. Doc. No. 21-1, at ¶ 50.

[21] *Id.* at ¶¶ 51–52.

[22] *See* R. Doc. No. 20-3, at 5; *see also id.* at 13.

[23] R. Doc. No. 20-3, at 9.

[24] *See, e.g.*, *id.* at 17.

[25] R. Doc. No. 21, at 5.

[26] *See* R. Doc. No. 20-3, at 5, 7; *see also* R. Doc. No. 21, at 5.

request,[27] and, in response, plaintiffs filed their FOIA request on September 7, 2023

with NAVFAC.[28] Plaintiffs requested the following nine categories of records (the

"FOIA request"):

> 1. All documents generated since February 1, 2023 between or among
> Navy personnel and the Concourse Group that relate to discussions or
> negotiations between and among NONH, LNFH, Patrician and the Navy
> with respect to the cost of or funding for insurance premiums for the
> Project.
>
> 2. All documents generated since February 1, 2023 that discuss the
> development of the Navy letter dated May 30, 2023 and the
> transmission of that letter to LNFH dated May 30, 2023 which the Navy
> labelled as a "Letter of Dissatisfaction".
>
> 3. All documents generated since February 1, 2023 that discuss the
> reasons for Navy's decision to travel to Louisiana to review books and
> records of NONH in July and August 2023.
>
> 4. All documents generated since February 1, 2023 to or from Concourse
> Group that discuss or relate to the Navy's review of books and records
> of NONH in July and August 2023.
>
> 5. All documents that discuss or relate to the results or findings of the
> Navy review books and records of NONH in in July and August 2023.
>
> 6. All documents generated by the Concourse Group since February 1,
> 2023 that suggest, recommend, reference in any manner or comment on

---

[27] *See* R. Doc. No. 20-3, at 12–13. According to a letter sent by NAVFAC BAM Tom
McKelvey, it is the Navy's position that, pursuant to the OA, "payment of insurance
premiums are the responsibility of" LNFH. *See id.* at 13. The Navy also states in that
letter that "[o]ne of the primary reasons for [denying the MORA disbursement] is that
[LNFH] never executed the legal documents needed to provide for the repayment of
PRF disbursements made in 2021 in the amount of $3,253,243.00." *Id.* The letter also
states: "In light of the aforementioned unexecuted PRF repayment agreement, the
propensity for severe storms in the Project's geographical area, and the relatively low
balance of the funds available in the PRF and MORA, the DON is concerned with the
short and long-term sustainment and recapitalization of the Project and thus, has
taken a conservative approach intended to preserve PRF and MORA funds for future
Project needs." *Id.*
[28] R. Doc. No. 20-2, at 1.

whether or not or under what terms to release funds from the Project Member Operating Reserve Account ("MORA") to cover insurance premium costs.

7. All documents that discuss the subsidy implemented through the National Defense Authorization Act ("NDAA") for 2018, pursuant to which the Navy provided certain funds to purportedly counteract the reductions to the Basic Allowance for Housing that were implemented through the NDAA for 2015, and specifically, all documents that discuss and determine that the subsidy, in whole or part, shall be deposited into the Project's MORA.

8. All documents that discuss the 2021 Property Management Incentive Fee request submitted by NONH on or about February 10, 2023, including but not limited to documents used by the Navy in the evaluation of that request and documents between the Concourse Group and the Navy that refer to or relate in any way to that request or the evaluation of that request.

9. All documents that discuss or refer to the release in 2021 of approximately $3,253,243 of funds from the Project Recapitalization Fund ("PRF") to NONH, including but not limited to any documents that relate or refer to any written terms that govern how those disbursements were to be handled or any future replenishment or repayment of any portion or all of those disbursements, which the Navy has claimed were "loans" and required a "loan repayment agreement" within 90 days".[29]

The request was forwarded to NAVFAC Southeast ("NAVFAC SE").[30] The Navy's

FOIA Coordinator, Atina Hall, then evaluated the request to determine "which offices

or records systems within the [Navy] may be reasonably expected to contain the

records requested."[31] Having determined that the PPV Department was the

---

[29] *Id.* at 9–10. For ease of reference, hereinafter each request will be referred to by number. For example, the first category of documents requested in plaintiffs' FOIA request will be referred to as "FOIA Request 1."
[30] *Id.* at 1.
[31] *Id.* at 3.

custodian of the responsive records, Hall forwarded the request to NAVFAC BAM and PPV Department Director Tom McKelvey.[32]

McKelvey conducted a search and provided 188 documents to Hall for review.[33] Hall and NAVFAC SE counsel met to determine "which documents were responsive to specific items in the request and which documents or portions thereof were to be protected from release under the FOIA exemptions."[34] On April 10, 2024, NAVFAC SE issued its response to plaintiffs' FOIA request.[35] With its response, it released 93 documents in full.[36] It also withheld 12 documents in part and 83 documents in full, citing multiple FOIA exemptions to justify its withholdings.[37]

On April 18, 2024, plaintiffs filed an administrative appeal to the Office of the General Counsel of the Department of the Navy ("OGC").[38] Without deciding whether the documents were properly withheld pursuant to the Navy's cited FOIA exemptions, the Deputy General Counsel of the Department of the Navy ("DGC") remanded the appeal to the Navy with direction to reconsider plaintiffs' FOIA request.[39] On June 12, 2024, the Navy issued a revised response that further explained its reasons for withholding the records and identified which FOIA

---

[32] *Id.*
[33] R. Doc. No. 20-2, at 1, 3–4.
[34] *Id.*
[35] *See id.* at 11–13.
[36] *Id.* at 4, 44.
[37] *See id.* at 4, 12.
[38] *See id.* at 15.
[39] *See* R. Doc. No. 20-2, at 41.

exemption it was invoking with respect to each withheld record.[40] No additional documents were released.[41]

Plaintiffs again appealed to the OGC.[42] The Navy included a more detailed index of the withheld records in its response to plaintiffs' second appeal, which detailed which of plaintiffs' nine categories of requests each document related to, the FOIA exemptions invoked with respect to each document, and a brief description of the document.[43] After considering plaintiffs' second appeal and the Navy's additional responses, the DGC issued a final determination denying plaintiffs' appeal and upholding the Navy's decision to withhold the documents based on FOIA Exemptions 4, 5, and 6.[44]

Plaintiffs filed the present suit in this Court on February 21, 2025, seeking immediate release of the withheld records.[45] Shortly thereafter, the Navy filed the motion[46] for summary judgment now before the Court, asking this Court to determine as a matter of law that the documents were properly withheld pursuant to FOIA Exemptions 4, 5, and 6. Plaintiffs filed a response[47] in opposition, arguing that the records the Navy has withheld fall outside of the exemptions it has invoked and, further, that the Navy has not met its burden of establishing FOIA's additional

---

[40] *See id.* at 43–50.
[41] *See id.* at 44.
[42] *See id.* at 51.
[43] *See id.* at 106–25.
[44] *See* R. Doc. No. 20-2, at 131–37.
[45] *See generally* R. Doc. No. 1.
[46] *See generally* R. Doc. No. 20.
[47] R. Doc. No. 21.

"foreseeable harm" standard.[48] The Navy filed a reply,[49] maintaining that it has met

its burden as to both the applicability of the FOIA exemptions and FOIA's foreseeable

harm requirement and, therefore, that it is entitled to judgment as a matter of law.

## II.    LEGAL STANDARDS
### a.    FOIA

"The FOIA was enacted to 'pierce the veil of administrative secrecy and to open

agency action to the light of public scrutiny.'" *Batton v. Evers*, 598 F.3d 169, 175 (5th

Cir. 2010). Upon request, "FOIA mandates the disclosure of documents held by a

federal agency unless the documents fall within one of nine enumerated exemptions."

*United States Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 267 (2021)

(citing 5 U.S.C. § 552(b)); *see also Texas Pub. Pol'y Found. v. Dep't of State*, 136 F.4th

554, 559 (5th Cir. 2025). Relevant to the parties' dispute, FOIA exempts the following

records from disclosure:

> (4)  trade secrets and commercial or financial information obtained from a
>      person and privileged or confidential;
>
> (5)  inter-agency or intra-agency memorandums or letters that would not be
>      available by law to a party other than an agency in litigation with the
>      agency, provided that the deliberative process privilege shall not apply to
>      records created 25 years or more before the date on which the records were
>      requested;
>
> (6)  personnel and medical files and similar files the disclosure of which would
>      constitute a clearly unwarranted invasion of personal privacy;

5 U.S.C. § 552 (b)(4)–(6).

---

[48] *See id.* at 8–10.
[49] R. Doc. No. 23.

Because the purpose of FOIA is disclosure, not secrecy, the exemptions are narrowly construed. *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001); *Batton*, 598 F.3d at 175. Still, "FOIA expressly recognizes that important interests are served by its exemptions, and those exemptions are as much a part of FOIA's purposes and policies as the statute's disclosure requirement." *Jobe v. Nat'l Transportation Safety Bd.*, 1 F.4th 396, 402 (5th Cir. 2021).

In addition to establishing that an exemption applies, an agency may withhold records from disclosure only if "the agency reasonably foresees that disclosure would harm an interest protected by an exemption." 5 U.S.C. § 552(a)(8)(A)(i)(I); *see Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 104 (D.D.C. 2019) (summarizing the history of the "foreseeable harm standard"); *Juul Labs, Inc. v. Food & Drug Admin.*, 731 F. Supp. 3d 46, 70 (D.D.C. 2024) ("Establishing that the deliberative process privilege applies does not end the inquiry. To withhold records pursuant to Exemption 5, an agency must also demonstrate that it 'reasonably foresees that disclosure would harm an interest protected by [the] exemption' to justify nondisclosure under the FOIA." (quoting 5 U.S.C. § 552(a)(8)(A)(i)(I))). This means that FOIA requires that an agency "release a record—even if it falls within a FOIA exemption—if releasing the record would not reasonably harm an exemption-protected interest." *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 106.

FOIA also requires a government agency to release "[a]ny reasonably segregable portion of a record . . . after deletion of the portions which are exempt."

5 U.S.C. § 552(b). "Accordingly, once an agency identifies a document that it believes qualifies for a FOIA exemption, it must undertake a segregability analysis, in which it separates the exempt from the non-exempt portions of the document, and produces the relevant non-exempt information." *Gahagan v. United States Citizenship & Immigr. Servs.*, 147 F. Supp. 3d 613, 630 (E.D. La. 2015) (Vance, J.) (citation modified).

Should a requester believe that the agency improperly withheld records, the requester may seek relief in federal district court "to enjoin the agency from withholding [the] records" and may ask the court "to order the production of any agency records improperly withheld." 5 U.S.C. § 552 (a)(4)(B).

### b.    Summary Judgment

Summary judgment "is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Batton*, 598 F.3d at 175 (quoting Fed. R. Civ. P. 56(c)). However, that standard is "modified" in the FOIA context, because "the threshold question in any FOIA suit is whether the requester can even see the documents the character of which determines whether they can be released." *Id.*

The FOIA statute provides that "when the Government withholds information from disclosure, the agency has the burden to prove de novo that the information is exempt from disclosure." *Id.* (citing 5 U.S.C. § 552 (a)(4)(B)); *see also Berk v. Exec. Off. of United States Att'ys*, No. 21-10693, 2022 WL 17337821, at *1 (5th Cir. Nov. 30, 2022) ("In a FOIA case, the agency has the burden of justifying nondisclosure.").

Accordingly, "because the burden to establish an exemption remains with the agency, the district court should not grant summary judgment based on a 'conclusory and generalized' assertion, even if the FOIA requester has not controverted that assertion." *Batton*, 598 F.3d at 175; *see also Texas Pub. Pol'y Found.*, 136 F.4th at 559 ("The agency relying on the exemption to prevent disclosure of information bears the burden of establishing that application of the exemption is appropriate.").

The government may satisfy its summary judgment burden of proof in a FOIA case "through the submission of affidavits that identify the documents at issue and explain why they fall under the claimed exemption." *Atchafalaya Basinkeeper, Inc. v. U.S. Army Corps of Eng'rs*, No. 21-317, 2022 WL 219050, at *3 (E.D. La. Jan. 25, 2022) (Zainey, J.); *Batton*, 598 F.3d at 175. These affidavits are entitled to a "'presumption of legitimacy' unless there is evidence of bad faith in handling the FOIA request." *Batton*, 598 F.3d at 176. Even so, that presumption "does not relieve the withholding agency of its burden of proving that the factual information sought falls within the statutory exemption asserted." *Id.*

A "*Vaughn* index" is a "routine device through which the defendant agency describes the responsive documents withheld or redacted and indicates why the exemptions claimed apply to the withheld material." *Id.* at 174; *see generally Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973). "An adequate *Vaughn* index must provide a 'detailed justification' for each of the agency's claimed exemptions to disclosure." *Gahagan*, 147 F. Supp. 3d at 627 (citing *Stephenson v. I.R.S.*, 629 F.2d 1140, 1145 (5th Cir. 1980)). Sufficiently detailed affidavits, declarations, or *Vaughn* indices can

sustain the government's summary judgment burden in the context of FOIA. *See Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*, 905 F. Supp. 2d 206, 212 (D.D.C. 2012) ("In a FOIA case, the Court may grant summary judgment based *solely* on information provided in an agency's affidavits or declarations when they 'describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'") (emphasis added); *Watkins L. & Advoc., PLLC v. United States Dep't of Just.*, 78 F.4th 436, 451 (D.C. Cir. 2023) ("An agency can carry [its] burden by submitting a *Vaughn* index that adequately explains the decision to withhold certain documents.").

The Court may also, in its discretion, review the withheld documents *in camera. Batton*, 598 F.3d at 175; *see also Rollins v. U.S. Dep't of Just.*, 8 F.3d 21 (5th Cir. 1993) ("The district court may conduct an in camera review of the challenged documents but is not required to do so."). As the Fifth Circuit has noted, "[m]ost FOIA cases are resolved at summary judgment." *Rutila v. United States Dep't of Transportation*, 72 F.4th 692, 694 (5th Cir. 2023).

## III.   ANALYSIS

Although the Navy invoked FOIA exemptions 4, 5, and 6 in its responses to plaintiffs' administrative appeals and in the *Vaughn* index[50] produced for this case,

---

[50] *See* R. Doc. No. 20-2, at 138–170 (Exhibit 10 to the Declaration of Atina Hall) (hereinafter, the "*Vaughn* index").

it focuses almost exclusively on Exemption 5 in its briefing before this Court.[51] In fact, the Navy makes clear that its argument is primarily that Exemption 5 protects all of the withheld documents from FOIA disclosure.[52] The Navy seems to urge the Court to decide the issue on Exemption 5 alone.[53] For this reason, and because the Navy need only meet its burden as to one FOIA exemption, the Court's analysis begins with Exemption 5.

### a.    Exemption 5

Recall that FOIA Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with an agency." *Jobe*, 1 F.4th at 403. This exemption "embodies two conditions." *Id.* (citing *Klamath*, 532 U.S. at 8). First, the communication must be "inter-agency or intra-agency." *Klamath*, 532 U.S. at 9. Second, "it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Id.*

With respect to the first condition, covered documents "are not limited to those between or among an agency's employees." *Id.* at 404. The exemption also embraces "records of communications between an agency and outside consultants . . . if they

---

[51] *See* R. Doc. No. 20-1, at 11–17; *see generally* R. Doc. No. 23 (discussing only Exemption 5).

[52] R. Doc. No. 20-1, at 17 ("[A]ll redactions by the Navy, whether in whole or in part, were rooted exclusively in FOIA Exemption 5. Still, FOIA Exemptions 4 and 6 *could also* apply to *some* of the withheld material. These secondary exemptions were made to preserve the exemptions." (emphasis in original)).

[53] *See id.* ("[T]he Court must deny Exemption 5 withholdings prior to the analysis of either FOIA Exemption 4 or 6. In other words, if the Court agrees the Navy properly withheld material under FOIA Exemption 5, that is the end of the analysis.").

have been created for the purpose of aiding the agency's deliberative process." *Id.* The so-called "consultant corollary" protects deliberative communications "with some non-agency experts whose input the agency has solicited." *Id.* at 399. While the consultant corollary does not extend to every actor supplying information to an agency for the purposes of aiding its decision,[54] the parties do not meaningfully dispute that the consultant corollary extends to TCG.[55] The Court likewise finds that TCG is a consultant for purposes of satisfying this first condition, and therefore, finds that the consultant corollary applies to the withheld documents and communications by TCG.[56] But the inquiry does not end there; the Navy must still satisfy Exemption 5's second condition. *Jobe*, 1 F.4th at 408 ("Of course, determining whether documents are intra-agency is only the first step in applying Exemption 5.").

As to this second condition, Exemption 5 "incorporates the privileges available to Government agencies in civil litigation, such as the deliberative process privilege, attorney-client privilege, and attorney work-product privilege." *Sierra Club*, 592 U.S.

---

[54] *See generally Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, (2001); *see also Jobe*, 1 F.4th at 407 (noting that "self-interest of some kind may prevent outside experts from being deemed consultants"); *see also Jobe*, 1 F.4th at 406 (suggesting that a decreased "degree of agency control over [the] non-agency part[y]" may weigh against a finding that the non-agency party was acting as a consultant).

[55] For instance, the parties do not dispute that "[t]he Navy's consultants on MHPI act in a capacity functionally equivalent to that of an agency employee, with no independent interest in the outcome of the deliberation and the consultant's role is solely advisory." R. Doc. No. 21-1, at 14. They also agree that the "Navy's consultants on MHPI operate under the direction and control of agency staff." *Id.* at 15. Plaintiffs further concede that the Fifth Circuit has adopted the consultant corollary, although they preserve their right of appellate review on the issue. *See* R. Doc. No. 21, at 11.

[56] *See, e.g.*, R. Doc. No. 20-2, at 138 (Docs. 1 & 2).

at 263. The Supreme Court of the United States has construed this exemption to include "those documents, and only those documents, normally privileged in the civil discovery context." *N. L. R. B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). Consequently, the ability in the civil discovery context for a "private litigant to override a privilege claim set up by the Government" by a showing of their "need in the context of . . . [their] particular case; or on the nature of the case" is irrelevant for purposes of determining whether the document is exempt pursuant to Exemption 5. *See id.* at n. 16 ("[I]t is not sensible to construe the Act to require disclosure of any document which would be disclosed in the hypothetical litigation in which the private party's claim is the most compelling. Indeed, the House Report says that Exemption 5 was intended to permit disclosure of those intra-agency memoranda which would 'routinely be disclosed' in private litigation, and we accept this as the law." (internal citations omitted)).

The Navy invokes the deliberative process privilege for each document in its *Vaughn* index.[57] The Navy additionally invokes the attorney-client privilege and attorney work product privilege for a handful of documents,[58] but, as plaintiffs point out, it makes no attempt to support its assertion of these additional privileges in its briefing.[59] More importantly, the Navy's description with respect to these documents is conclusory and cannot carry its summary judgment burden of demonstrating that

---

[57] *See generally Vaughn* index.
[58] *See Vaughn* index, Docs. 7, 13, 40–41, 76 and 1P.
[59] *See generally* R. Doc. Nos. 20, 23.

the attorney-client privilege or attorney work product privilege applies.[60]
Consequently, the Navy's success in invoking Exemption 5 rises and falls with its
ability to establish that the deliberative process privilege applies to each withheld
document.

i. *Deliberative Process Privilege*

The deliberative process privilege protects from disclosure "documents
reflecting advisory opinions, recommendations and deliberations comprising part of
a process by which governmental decisions and policies are formulated." *Sierra Club*,
592 U.S. at 267. The purpose of the privilege is "[t]o protect agencies from being forced
to operate in a fishbowl" when making decisions. *Id.* (internal quotations omitted).
"The privilege is rooted in 'the obvious realization that officials will not communicate
candidly among themselves if each remark is a potential item of discovery and front
page news.'" *Id.* (quoting *Klamath*, 532 U.S. at 8–9); *see also Skelton v. U.S. Postal
Serv.*, 678 F.2d 35, 38 (5th Cir. 1982) ("The purpose of the privilege is to protect the
decision-making process from the inhibiting effect that disclosure of predecisional

---

[60] *See, e.g.*, Doc. 13 ("[N]otes, input and the opinion of Tom McKelvey of what
transpired during a meeting with LNFH officers and *their attorney*. It also provides
DON's steps moving forward. . . . This document is also protected under Attorney-
Client Privilege since Agency Counsel was requested to provide an assessment of
potential risks due to potential lawsuit against the DON as Member of NONH LLC")
(emphasis added); *see also Gahagan*, 147 F. Supp. 3d at 629 ("In the context of a FOIA
request, the agency is the 'client' and the agency's lawyers are the 'attorneys' for the
purposes of attorney-client privilege. To invoke the privilege, the agency 'must show
that the withheld document (1) involves confidential communications between an
attorney and the agency and (2) relates to a legal matter for which the agency has
sought professional advice.'" (citation modified)).

advisory opinions and recommendations might have on the frank discussion of legal or policy matters in writing." (internal quotations omitted)). Consistent with its purpose, the privilege often covers documents that "reflect the personal opinions of the writer rather than the policy of the agency." *Batton*, 598 F.3d at 183.

The deliberative process privilege does not protect "documents that embody a final decision, because once a decision has been made, the deliberations are done." *Sierra Club*, 592 U.S. at 268; *see also id.* ("The privilege therefore distinguishes between predecisional, deliberative documents, which are exempt from disclosure, and documents reflecting a final agency decision and the reasons supporting it, which are not."). Similarly, the privilege does not protect purely "factual material that does not reveal the deliberative process." *Batton*, 598 F.3d at 183 (internal alternations omitted); *see Skelton*, 678 F.2d at 39 ("While the deleted material contained some assertions of fact, the deleted material was an evaluation of the facts based on . . . the writer's own values. And therefore was exempt from disclosure." (citation modified)); *Jud. Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252, 262 (D.D.C. 2004) (holding that the privilege protects "documents in which an agency has winnowed a mass of information into a small set of facts which, if revealed, would unveil the agency's reasoning by showing what it considered relevant (and irrelevant)." (citation modified)).

To be exempt from disclosure under the deliberative process privilege, the documents must be both "predecisional" and "deliberative." *Sierra Club*, 592 U.S. at 268; *Gahagan*, 147 F. Supp. 3d at 629. "Documents are 'predecisional' if they were

generated before the agency's final decision on the matter, and they are 'deliberative' if they were prepared to help the agency formulate its position." *Sierra Club*, 592 U.S. at 268; *see also Jobe*, 1 F.4th at 408 ("Predecisional documents include those 'generated before the adoption of an agency policy.' Deliberative ones 'reflect the give-and-take of the consultative process.'" (internal citations omitted)) (quoting *Jud. Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141 (D.C. Cir. 2006)).

Because the deliberative process privilege's "ultimate aim is to prevent injury to the quality of agency decisions," the key inquiry in determining whether to apply the exemption to a given record is "whether disclosure would tend to diminish candor within an agency." *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1433–34, 1435 (D.C. Cir. 1992); *see also Gahagan*, 147 F. Supp. 3d at 629–30 ("In other words, the document must be such that public disclosure 'would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions.'").

The parties disagree with respect to whether the documents withheld by the Navy fall within the scope of the privilege. Plaintiffs argue they do not, because the "decisions" being made by the Navy do not "bear on the formulation or exercise of agency *policy-oriented judgment*."[61] Rather, plaintiffs argue, the decisions merely relate to "matters of contract administration," because all the withheld documents

---

[61] R. Doc. No. 21, at 12 (emphasis added) (quoting *Petroleum Info. Corp.*, 976 F.2d at 1435).

"relate to the Navy's and Plaintiffs' rights, duties, and conduct under the agreements governing" NONH.[62] And, according to plaintiffs, matters of contract administration fall outside of the deliberative process privilege.[63] In support of this contention, plaintiffs cite to a number of instances that courts in the civil discovery context have "reject[ed] deliberative process privilege claims regarding materials prepared in the course of contract administration."[64] Plaintiffs argue that these cases show that Exemption 5 does not apply to these types of documents, because they are "exactly the documents that routinely would 'be available by law' in contract litigation related to the Project."[65]

The Navy, on the other hand, seems to take a broader view with respect to the range of agency decisions that the deliberative process privilege protects.[66] At the very least, the Navy asserts that the documents at issue fall within the privilege because they "were part of the agency's internal deliberative process, intended to assist decision-makers . . . in reaching" decisions related to:

> (1) the short and long-term sustainment and recapitalization of the Project; (2) LNFH's refusal to replenish the Project's Recapitalization Fund (PRF) in the amount of $3,253,243.00 after disbursements were made in 2021; (3) LNFH's request for a Member Operating Reserve Account (MORA) disbursement in the amount of $4M to cover the total sum owed by LNFH for the Project's 2023 insurance premiums; (4) LNFH's request to prioritize the distribution of the Property Manager Incentive Fee and the Asset Manager Fee to the replenishment of the Project's accounts; and (5) [] the Navy [] taking precautionary measures

---

[62] *Id.* at 16.

[63] *Id.* at 15.

[64] *Id.* at 14.

[65] *Id.* at 17.

[66] *See* R. Doc. No. 20-1, at 13 ("Exemption 5 applies so long as a document is generated as part of, and contributes to, a continuing process of agency decision making.").

in its oversight role and a conservative approach on the Project's financials to preserve PRF and MORA funds for future Project needs.[67]

Furthermore, the Navy argues that plaintiffs' reliance on civil contract dispute cases is "misplaced."[68] The Navy reminds plaintiffs that "[w]hile in civil discovery, qualified privileges may be overcome by a showing of relevance or need by an opposing party, in the FOIA context, courts do not take into account a party's need for the documents in ruling on a privilege's applicability."[69] Therefore, the Navy urges, "it is paramount to rely on prior FOIA cases" and not civil contract case law.[70]

As a threshold matter, the Court agrees that the civil contract cases cited by plaintiffs have limited influence on the FOIA issue before this Court. The fact that a document was discoverable in a prior litigation does not mean that all like documents "must be disclosed to anyone under the FOIA." *F.T.C. v. Grolier Inc.*, 462 U.S. 19, 28 (1983) (holding that this argument was "rejected" because "[i]t is not difficult to imagine litigation in which one party's need for otherwise privileged documents would be sufficient to override the privilege but that does not remove the documents from the category of the normally privileged"). However, the Court will consider plaintiffs' cases to the extent that plaintiffs cite to them to demonstrate that decisions related to contract administration are not the type of deliberative processes covered by Exemption 5.

---

[67] *Id.* at 14.
[68] R. Doc. No. 23, at 4.
[69] *Id.*
[70] *See id.* at 7.

### 1. Which Deliberative Processes Does the Privilege Protect?

Plaintiffs' argument rests on the idea that "[n]ot every decision made within an agency will entail the kind of 'consultative process' the deliberative process privilege is designed to protect." *Nat. Res. Def. Council v. United States Env't Prot. Agency*, 19 F.4th 177, 184 (2d Cir. 2021). As the D.C. Circuit stated in *Petroleum Information Corporation v. U.S. Department of Interior*: "[t]he deliberative process privilege . . . is centrally concerned with protecting the process by which *policy* is formulated." 976 F.2d 1429, 1435 (D.C. Cir. 1992) (emphasis added).

In *Petroleum Info. Corp.*, the D.C. Circuit held that an unfinished draft of a public lands data bank was not protected by the deliberative process privilege, because it did not "bear on the formulation or exercise of agency policy-oriented judgment." *See id.* at 1435. Although the agency's task "to organize public records in a more manageable form, [the data bank,] and to correct any errors it finds in the process" inevitably involved deliberation in some capacity, the draft was not privileged because it lacked any "association with a significant policy decision." *Id.* at 1438 ("The objective, in sum, is not so much to select and edit as to reorganize and repackage a mass of dispersed public information."). In this way, the court was attempting to distinguish an agency's "technical, record-keeping" tasks with its "exercises of discretion and judgment calls." *Id.* at 1438–39; *see also id.* at 1436 ("The release of materials that do not embody agency judgments—for example, materials relating to standard or routine computations or measurements over which the agency

has no significant discretion—is unlikely to diminish officials' candor or otherwise injure the quality of agency decisions.").

The *Petroleum Info. Corp.* court found that delineating tasks along a policy-oriented line reflected the privilege's purpose. *See id.* at 1435 ("Inquiring whether the requested materials can reasonably be said to embody an agency's policy-informed or -informing judgmental process therefore helps us answer the 'key question' in these cases: whether disclosure would tend to diminish candor within an agency."); *see also id.* at 1436 n. 8 ("Even the most mundane material could be said to reflect the exercise of agency discretion in some sense, for example, by indicating the typeface an official favors. To be protected under Exemption 5, the kind and scope of discretion involved must be of such significance that disclosure genuinely could be thought likely to diminish the candor of agency deliberations in the future." (internal citations omitted)). This distinction also helped determine when a document containing the collection of factual material was covered by the privilege and when it fell outside the privilege. *Id.* at 1435 ("[D]ecisions, which caution against reflexive fact/opinion characterization as the way to decide the full range of Exemption 5 cases, sound a common theme: To fall within the deliberative process privilege, materials must bear on the formulation or exercise of agency policy-oriented *judgment*." (emphasis in original)).

Courts adopting *Petroleum Info. Corp.* have taken this principle to mean that "the privilege does not protect a document which is merely peripheral to actual policy formation." *Moye, O'Brien, O'Rourke, Hogan, & Pickert v. Nat'l R.R. Passenger Corp.*,

376 F.3d 1270, 1277–78 (11th Cir. 2004); *Nat. Res. Def. Council*, 19 F.4th at 191; *see also Legal & Safety Emp. Rsch., Inc. v. U.S. Dep't of the Army*, No. S001748, 2001 WL 34098652, at *6 (E.D. Cal. May 4, 2001) ("However, even if these evaluations are characterized as predecisional, the decision they would precede is not a 'policy decision,' as required by Exemption 5. Defendant does not cite, and the court cannot find any authority to support a finding that the decision to award a government procurement contract is the type of policy decision contemplated by Exemption 5."); *BuzzFeed, Inc. v. U.S. Dep't of Just.*, 419 F. Supp. 3d 69, 77 (D.D.C. 2019) ("[I]t is not clear that the . . . [documents] had anything to do with the 'give-and-take of the consultative process' that leads to policy.").

Plaintiffs essentially contend that matters of contract administration categorically fall outside of the deliberative process privilege because they typically address "mundane, technical, fact-intensive" decisions and are therefore not "policy-oriented judgments."[71] However, the Court does not agree that the civil decisions cited by plaintiffs stretch as far as plaintiffs claim; namely, that these decisions "doom the Navy's deliberative process privilege claims" because "[t]he documents at issue all relate to the Navy's and Plaintiffs' rights, duties, and conduct under the

---

[71] R. Doc. No. 21, at 15 ("Consistent with the limitation of the deliberative process privilege to materials bearing on the formulation or exercise of agency policy-oriented judgment, government-contract tribunals regularly hold that documents related to matters of contract administration fall outside of the privilege because they do not involve protected advisory opinions or legal or policy recommendations' and instead typically address 'factual matters." (citation modified)).

agreements governing the Project."[72] Plaintiffs seem to forget that it is "the character of [the documents] which determines whether they can be released." *Batton*, 598 F.3d at 175.

In all the cases cited by plaintiffs, the documents at issue were evaluative, investigative documents of the type that are generated in the ordinary course of government contracting business. *See 4k Glob.-Acc Joint Venture, LLC,* Appellant, 22-1 B.C.A. (CCH) ¶ 38032 (Feb. 10, 2021); *Walsky Const. Co. v. United States*, 20 Cl. Ct. 317, 321 (1990) (document withheld was a factual "investigation" that was "informational in nature" and merely "supplie[d] the raw data upon which decisions can be made"); *Unisys Corp.*, GSBCA No. 12823-COM, 95-2 B.C.A. (CCH) ¶ 27903 (Aug. 10, 1995) (distinguishing evaluative reports) ("Evaluation reports that provide information or raw data are not themselves part of the decisional process. Thus, investigations conducted to evaluate agency performance are not necessarily privileged."); *Lapidus L. Firm, PLLC v. Washington Metro. Area Transit Auth.*, No. CV 20-161 (JDB), 2021 WL 6845004, at *4 (D.D.C. Feb. 25, 2021) (holding that an evaluative cost estimate was likely not deliberative).

These documents were often devoid of recommendations or proposed solutions for a specific decision or policy. *See, e.g.*, *Walsky Const. Co.,* 20 Cl. Ct. at 322 ("Thus, the Unit Effectiveness Investigation report does not contain the advice, opinions, and

---

[72] *Id.* at 16; *see also id.* at 17 ("The case law refusing to apply the deliberative process privilege to matters of routine contract administration should obviate any need for a detailed review of the Exemption 5 claims in the Navy's *Vaughn* index and supporting declarations.").

recommendations typically protected by executive privilege."); *Unisys Corp.*, GSBCA No. 12823-COM, 95-2 B.C.A. (CCH) ¶ 27903 (Aug. 10, 1995) ("[T]he notes describe past occurrences, chiefly factual matters, rather than policy recommendations for future conduct. While the notes may have been used as supporting information for the recommendations . . ., they are not themselves policy discussions or recommendations."). And while the documents at issue sometimes contained an individual's opinions in the literal sense, they were opinions given to the contracting officer as they were performing the evaluative, information-gathering task. *See, e.g.*, *In Re Brero Const., Inc.*, LBCA No. 1997-BCA-4, 1999 WL 624138 (June 18, 1999) ("A general assertion that the disclosure would cause a chilling effect upon the process whereby subordinates disclose facts and make recommendations to the CO in the ordinary course of contract administration is hardly persuasive. In this case, the subordinate involved may be largely responsible for, and may be principal witnesses to, the day-to-day implementation of the contract, and they may have interacted personally, not only with the CO, but with the contractor.").

Consequently, the Court finds that plaintiffs' argument goes too far. The Court will not categorically exclude all the documents the Navy withheld from deliberative process privilege protection merely because the Navy's decisions were made in the context of a contractual relationship with LNFH. Rather, these cases are consistent with *Petroleum Info. Corp.* in that they stand for the idea that the privilege treats differently those documents reflecting an agency's "technical, record-keeping" tasks

and those embodying "exercises of discretion and judgment calls." *Petroleum Info. Corp.*, 976 F.2d at 1438.

Moreover, the decisions that these documents pertain to are ones in which the Navy exercises considerable discretion,[73] and that arise in part from Congress' mandate that the Navy oversee the financial health of its MHPI projects. *See, e.g.*, 10 U.S.C. § 2885 (discussing the military branches' "oversight and accountability" responsibilities, including responsibilities related to "financial health" of the project); § 2884(c) (requiring the Secretary of Defense to report semiannually information about the financial health of the project). Disclosure of

these records may well inhibit the candor in which Navy personnel discuss future decisions regarding NONH or any of its other MHPI projects. The deliberative processes at play in this case are not merely peripheral to policy such that they are categorically outside the scope of the privilege.[74] *Cf. Am. Mgmt. Servs., LLC v. Dep't*

---

[73] *See, e.g.*, R. Doc. No. 21-3, at 32 ("The books and records of [NONH] shall be maintained at the [LNFH's] principal office and shall be open to inspection by the [Navy] at all reasonable times during any business day."); *id.* at 25 ("[LNFH] may withdraw funds on deposit in the PRF only upon the written approval of the [Navy]"); *id.* ("The Managing Member may withdraw funds on deposit in the MORA to pay to the Company up to $250 per unit for unpaid damages above normal change of occupancy costs in units formerly occupied by military tenants. Any other withdrawal of funds from the MORA may only occur upon the written approval and direction of the Member.").

[74] The Court notes that the Fifth Circuit has neither adopted nor rejected the policy-oriented prerequisite articulated in *Petroleum Info. Corp.* Nevertheless, the Court makes this finding regarding the Navy's claims under the policy-oriented standard because the standard narrows the scope of the privilege rather than expands it. *See Batton,* 598 F.3d at 175 (stating the exemptions should be construed narrowly). Review of Fifth Circuit cases applying the deliberative process privilege further supports the Court's finding that the deliberative processes at issue fall within the privilege, because the deliberative processes at issue in those cases are far less policy-

*of the Army*, No. 11-442, 2012 WL 13194719, at *1 (E.D. Va. Jan. 30, 2012), *aff'd*, 703 F.3d 724 (4th Cir. 2013) (finding the Army's determinations regarding its property manager in the context of an MHPI housing project were policy oriented) ("These communications are (i) deliberative, because they reveal Army personnel's evaluations of proposed policies rather than final determinations, and (ii) predecisional, because they relate to policy decisions that Army personnel were contemplating, such as when and how to transfer property management responsibilities away from Pinnacle, how to manage public reaction to Pinnacle's termination, and whether to continue to fund the litigation against Pinnacle in Georgia state court.").

Having rejected plaintiffs' categorical argument that the deliberative process privilege does not apply to documents generated in the course of the Navy's NONH-related decisions, the Court must now assess the sufficiency of the Navy's justification for applying the deliberative process privilege to each of the withheld documents. *See Ctr. for Biological Diversity v. U.S. Env't Prot. Agency*, 369 F. Supp. 3d 1, 23 (D.D.C. 2019).

---

oriented than the decisions made by the Navy. *See May v. Dep't of Air Force*, 777 F.2d 1012, 1014 (5th Cir. 1985) (finding predecisional and deliberative documents that contained individual opinions and recommendations on whether to promote a lieutenant); *Skelton*, 678 F.2d at 38 (finding predecisional and deliberative an employee's written "view" of the circumstances of a particular incident which led to the agency's determination not to take disciplinary action against another employee); *Batton*, 598 F.3d at 183 (finding predecisional and deliberative IRS audit file deciding whether to pursue further action with respect to an individual taxpayer).

## 2.  The Navy's *Vaughn* Index

Recall that the Navy bears the burden of establishing that the exemption applies, and that it can sustain that burden with sufficiently detailed affidavits or a *Vaughn* index. The affidavits and index must "contain enough information to permit the Court to determine whether [the] privilege applies." *Gahagan*, 147 F. Supp. 3d at 629; *see also Watkins*, 78 F.4th at 451 (stating that the supporting material must "demonstrate that the information withheld logically falls within the claimed exemption"). The evidence must "identify the documents at issue, including the relevant information contained in each document, and explain why the asserted exemptions justify withholding." *Batton*, 598 F.3d at 176. In the context of the deliberative process privilege, the Navy must "establish what deliberative process is involved, and the role played by the documents in issue in the course of that process." *Gahagan*, 147 F. Supp. 3d at 630 (citation modified). "Conclusory assertions that merely parrot the legal test do not suffice." *Id.*

Plaintiffs argue that the Navy has failed to meet its burden.[75] They assert four main arguments with respect to a subset of the documents listed in the *Vaughn* index:[76] (1) the Navy takes a "conclusory approach to invoking the deliberative process privilege;" (2) the withheld documents reflecting the "notes" and "opinion" of Navy official Tom McKelvey describe only factual information and do not explain

---

[75] *See* R. Doc. No. 21, at 17–20.

[76] *See id.* at 20 ("The above discussion of particular documents highlights repeated examples of numerous deficiencies in the Navy's *Vaughn* index; it does not attempt to catalog those deficiencies comprehensively.").

what decision they might pertain to; (3) a number of the documents withheld address "technical, fact-intensive matters that generally fall outside of the deliberative process privilege;" and (4) a number of the documents reflect "mundane matters" such as "[r]esponding to a request for agency counsel's contact information . . . that fall far outside of the deliberative process privilege's scope."[77] As to the remaining documents, plaintiffs argue that they "nonetheless fall outside of the deliberative process privilege (or, alternatively, do not satisfy § 552(a)(8)(A)(i)(I)'s foreseeable harm standard) because, among other reasons, they all relate to fact-intensive matters of contract administration," or at the very least, "contain segregable, nonexempt factual information that the Navy must disclose."[78]

In its reply, the Navy urges the Court to consider its entire submission when evaluating whether it is entitled to summary judgment, and not just the *Vaughn* index.[79] It maintains that its submission—which includes the entire administrative record, affidavits, and its *Vaughn* index—taken as a whole, is sufficient to meet its burden.[80] The Court finds no reason to ignore the entire record when making its summary judgment determination. *See Batton*, 598 F.3d at 177–78 (considering the entire summary judgment record to determine whether the agency had met its burden of proving the exemption applied).

---

[77] *Id.* at 18–20.
[78] *Id.* at 20.
[79] R. Doc. No. 23, at 3.
[80] *Id.* at 3–4.

31

When the Navy's *Vaughn* index sufficiently describes the withheld record, the Court need not look further. However, where other evidence in the record provides additional context or description for a given document, the Court will take that evidence into consideration. For example, the Navy provided a *Vaughn* index of sorts in its response to plaintiffs' second administrative appeal[81] which, at times, provides information that is not contained in the primary *Vaughn* index. The Navy's response to plaintiffs' second appeal also includes a "foreseeable harm reasoning" section that, in part, provides additional information about the documents that were withheld with respect to each of plaintiffs' FOIA Requests.[82] The Navy's *Vaughn* index also explains which of plaintiffs' nine requests the document is responsive to,[83] which may help explain how a document is "predecisional," because it points to a decision to which the document pertains. The Court will first address the four groups of documents explicitly challenged by plaintiffs, and then it will address the remaining documents.

*Documents 1, 3, 11, 16, 21, 31–32, 37–39, 50, 56, 76, 2P, 3P(b)–(c), 5P:* Plaintiffs' challenge with respect to these *Vaughn* index entries is that they "contain little more than a conclusory assertion that they relate to a deliberative process."[84] The Court agrees with respect to Documents 11, 16, 31–32 , 38–39, 50, and 76, but disagrees as to Documents 1, 3, 21, 37, 56, 2P, 3P(b)–(c), and 5P.

---

[81] *See* R. Doc. No. 20-2, at 106–25.

[82] *See id.* at 127–29.

[83] *See, e.g.*, *id.* at 138 (including a column named "FOIA Related Request").

[84] R. Doc. No. 21, at 17.

For example, plaintiffs argue that Document 1 is conclusory because it states that the document addresses "'open and active issues' between the Navy and LNFH, as well as the Navy's potential responses."[85] This description, plaintiffs argue, lacks the detail necessary to establish that the deliberative process privilege applies. But the Court disagrees.

The *Vaughn* index describes Document 1 as an "[e]mail from [TCG] to Tom McKelvey (NAVFAC SE, Business Agreements Manager) providing an attachment with a summary of the open and active issues between the DON ('Member') and LNFH ('Managing Member') of the Project and potential DON responses to LNFH."[86] It further explains the attachment as "TCG's work product *analyzing* the open and active issues between [the Navy and LNFH] in connection to the privatized housing Project."[87] Like all of the Navy's *Vaughn* index entries, the Document 1 entry explains which FOIA request the entry relates to.[88] In this instance, the index indicates Document 1 is responsive to plaintiffs' FOIA Request 1, which sought documents related to LNFH's request for funding to cover the increased insurance premiums.[89] Furthermore, the Navy's response to plaintiffs' second administrative appeal explains that "LNFH's request [was] for [a] $4M loan out of the MORA account to cover the 2023 insurance premiums of the Project," an account on which "[t]he DON

---

[85] *Id.* at 18.
[86] R. Doc. No. 20-2, at 138.
[87] *Id.* (emphasis added).
[88] *See id.*
[89] *Id.*

has discretion [] how [it] is used."[90] The Court finds that the Navy's description of the document and context demonstrates that the document was logically withheld under the deliberative process privilege.

Accordingly, as stated, the Court finds the Navy's descriptions are sufficient with respect to Documents 1, 3, 21, 37, 56, 2P, 3P(b)–(c), and 5P, but not Documents 11, 16, 31–32, 38–39, 50, and 76. Although not flagged by plaintiffs as being conclusory, the Court also finds the Navy's descriptions of Documents 42–44, 46–49, and 8P deficient, because it finds they lack sufficient information to demonstrate that the privilege applies.

*Documents 4–5, 7, 9, 13–14, 22–23*: Plaintiffs' issue with these *Vaughn* index entries is that they all similarly describe the document as containing the "notes and opinion of Navy BAM Tom McKelvey regarding 'what transpired during a meeting' . . . and . . . the Navy's 'steps moving forward.'"[91] Plaintiffs find three flaws with this description. First, that it is not clear from this description to "what decision-making process the documents contributed."[92] Second, in part because McKelvey is the "relevant decisionmaker," the documents "appear to describe decisions already made."[93] Third, that "'what transpired during a meeting' is factual and thus falls outside of the deliberative process privilege."[94]

---

[90] *See id.* at 127.
[91] R. Doc. No. 21, at 18.
[92] *Id.* at 19.
[93] *Id.*
[94] *Id.*

While the first error is cured by considering the column that indicates which of plaintiffs' FOIA requests the document is responsive to, the Court agrees that the other two issues render the Navy's withholding of these documents questionable.[95] As such, the Court finds these *Vaughn* index entries insufficient to carry the Navy's burden of demonstrating that the deliberative process privilege applies.

*Documents 8, 10, 19, 25, 33–36, 40–41, 59, 68-70, 75, 3P(a)*: Plaintiffs claim that these entries describe documents that "address mundane, technical, fact-intensive matters that generally fall outside of the deliberative process privilege."[96] The Court disagrees with respect to Documents 19, 33–35, 59, 68–70, and 75. While these documents may include technical, financial matters, their descriptions make clear that they reflect opinions, based on these factual matters, regarding how to handle different decisions that had to be made by the Navy, and therefore, are deliberative rather than evaluative or purely factual. *Skelton*, 678 F.2d at 38 ("[T]his court and others have recognized that analysis and evaluation of facts are as much a part of the deliberative process as analysis and evaluation of law.").

Take, for example, Document 19, which is described as "email communications" containing "opinions of NAVFAC SE and NAVFAC LANT personnel regarding the financial sustainability of the Project and how it will be affected by future project costs."[97] This, alone, could describe purely factual,

---

[95] For one thing, how is the Court to determine whether the "Navy's steps moving forward" are forward-looking recommendations rather than, say, a recitation of the "steps moving forward" that had already been decided at the meeting.

[96] R. Doc. No. 21, at 19.

[97] R. Doc. No. 20-2, at 144.

evaluative matters. However, the *Vaughn* index also indicates that these communications "discuss[] next steps" and were responsive to plaintiffs' FOIA Requests 1, 2, and 3, which involve the Navy's process to determine whether and how to fund the cost of the project's increased insurance premiums, whether to send the Letter of Dissatisfaction, and whether to exercise its right to review the project's books and records.[98] The *Vaughn* index also indicates that the Navy has already released the segregable portions to LNFH.[99] Taken together, the Court finds the Navy has met its burden of demonstrating that it withheld only information that is covered by the deliberative process privilege.

Other examples include Documents 33–35, which plaintiffs describe as a "review of the 'Project's financials.'"[100] All three documents are described as "email communications" between "NAVFAC and NAVFAC LANT's personnel regarding [the] Project's financial review. The Project's financials and ledgers were subsequently evaluated, in person, at the Project's offices."[101] The Navy attests that all three documents are responsive to plaintiffs' request for documents that "discuss the *reasons* for the Navy's *decision* to . . . review books and records of NONH."[102] Read together, the Court finds this sufficiently describes documents that contain privileged deliberative process information and not technical or factual matters.

---

[98] *Id.*

[99] *Id.*

[100] R. Doc. No. 21, at 19.

[101] R. Doc. No. 20-2, at 149.

[102] *Id.* (emphasis added).

The Court therefore finds the Navy's description with respect to Documents 19, 33–35, 59, 68–70, and 75 is sufficient. However, the Court agrees with plaintiffs that Documents 8, 10, 25, 36, 40–41, and 3P(a) have not been described sufficiently for the Court to conclude they fall within the deliberative process privilege.

_Documents 45, 6P-7P, 10P–11P_: In short, plaintiffs argue that the decisions to which these documents relate are too "mundane" to constitute the type of decisions covered by the deliberative process privilege.[103] For example, Document 45 is described in the _Vaughn_ index as being "email communications" that contain the "opinion and comments of NAVFAC SE personnel re: LNFH's request to contact [the Navy's] counsel."[104] Plaintiffs argue that "[r]esponding to a request for agency counsel's contact information" is not the type of matter the deliberative process is meant to protect. Another example, Document 10P, is described as email communications that "reflect the agency's deliberation on LNFH's request of information on [the Operating Agreement] and Indenture revisions."[105] Even considered in the context of the FOIA request each of these documents is responsive to, the Court finds that these document descriptions do not sufficiently establish that they "would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." _Gahagan_, 147 F. Supp. 3d at 629–30, Based on these

---

[103] R. Doc. No. 21, at 20.
[104] _Id._ at 152.
[105] R. Doc. No. 20-2, at 169.

descriptions alone, the Court cannot determine whether the Navy properly withheld these documents pursuant to the deliberative process privilege.

*Remaining Documents 2, 6, 12, 15, 17–18, 20, 24, 26–30, 51– 55, 57–58, 60–67, 71– 74, 77–83, 1P, 4P, 9P, and 12P:* The only challenge plaintiffs articulate as to these remaining documents is the same policy-oriented argument that the Court has already rejected.[106] Having reviewed the *Vaughn* index entries for these remaining documents, the Court finds the Navy's descriptions as to all but two of the remaining documents (Documents 65 and 80) are sufficient to demonstrate that the deliberative process privilege applies. With respect to Documents 65 and 80, it is unclear to the Court whether these documents precede the decision to which they purportedly pertain. *Jobe*, 1 F.4th at 408 ("Predecisional documents include those generated *before* the adoption of an agency policy.") (citation modified); *see also Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 103 (finding that the agency failed to meet its burden of establishing that the deliberative process privilege applied because the agency "failed to establish that the documents predated those final decisions").

The Court therefore orders the Navy to supplement its *Vaughn* index with respect to those documents that the Court has identified as insufficiently described.

### 3. Foreseeable Harm

Demonstrating that the exemption applies is only the first part of the inquiry; the Navy must also satisfy FOIA's additional "foreseeable harm" requirement. *See* 5

---

[106] *See* R. Doc. No. 21, at 20 ("Documents not specifically addressed above nonetheless fall outside of the deliberative process privilege . . . because, among other reasons, they all relate to fact-intensive matters of contract administration.").

U.S.C. § 552(a)(8)(A)(I) ("An agency shall . . . withhold information under this section *only if* . . . the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b)[.]" (emphasis added)); *see also Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation,* 3 F.4th 350, 369 (D.C. Cir. 2021) ("Finding the deliberative process privilege applicable to some of the withheld materials does not end the matter."); *Jarkesy v. Sec. & Exch. Comm'n,* No. 22-405, 2024 WL 4101811, at *9 (S.D. Tex. July 3, 2024) (applying the additional foreseeable harm requirement after determining whether the asserted FOIA exemptions were applicable). The requirement applies with "special force" in the deliberative process privilege context. *See Juul Labs, Inc.*, 731 F. Supp. 3d at 59 ("[T]he withholding agency must also satisfy the foreseeable-harm requirement, which applies with special force to deliberative process withholdings under Exemption 5, given the particular risks of overuse of that privilege." (citation modified)).

To satisfy the foreseeable harm requirement, the withholding agency must "articulate both the nature of the harm and the link between the specified harm and specific information contained in the material withheld." *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 106 (quoting H.R. Rep. No. 114-391, at 9 (2016)). The agency must provide "context or insight into the specific decision-making processes or deliberations at issue, and how they in particular would be harmed by disclosure" to satisfy its burden. *Id.* at 107; *see also Freedom of the Press*, 3 F.4th 350, 370 (holding that the agency must demonstrate why disclosure of the withheld material

39

"in the specific context of the agency action at issue, actually impede[s] those same agency deliberations going forward"). "Agencies cannot rely on mere speculative or abstract fears, or fear of embarrassment to withhold information." *Freedom of the Press*, 3 F.4th at 369 (internal quotations omitted); *Emuwa v. United States Dep't of Homeland Sec.*, 113 F.4th 1009, 1015 (D.C. Cir. 2024) ("[The government] must show that disclosure of the requested information 'would' chill future internal agency deliberations, not simply that it 'could' do so.").

Withholding agencies "may sometimes satisfy [the foreseeable harm] burden on a category-by-category basis rather than a document-by-document basis." *Freedom of the Press*, 3 F.4th at 369 ("[A]gencies may sometimes satisfy that burden on a category-by-category basis rather than a document-by-document basis—that is, group together like records and explain the harm that would result from release of each group . . ."). However, "the basis and likelihood of that harm must be independently demonstrated for each category," *id.*, meaning the agency "must provide more than nearly identical boilerplate statements and generic and nebulous articulations of harm" with respect to each category of documents, *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 106; *see also Jud. Watch, Inc. v. U.S. Dep't of Com.*, 375 F. Supp. 3d 93, 100 (D.D.C. 2019) ("[T]he government at least need[s] to do more than perfunctorily state that disclosure of all the withheld information . . . would jeopardize the free exchange of information." (internal quotations omitted)).

Plaintiffs accuse the Navy of "not meaningfully attempt[ing]' to show the required foreseeable harm.[107] It argues that the Navy has merely "mouth[ed] the generic rationale for the asserted exemption, which does not satisfy § 552(a)(8)(A)(i)(I)."[108] In reply, the Navy accuses plaintiffs of "pick[ing] and choos[ing] parts of the administrative record to convince the Court the Navy did not evaluate its withholdings under the foreseeable harm standard."[109] Instead of relying on the *Vaughn* index or "limited language in the declarations" alone, the Navy argues the Court must consider "the entire administrative record . . . as a whole."[110] Specifically, the Navy points the Court to its response in plaintiffs' second administrative appeal,[111] in which the Navy explains its foreseeable harm reasoning categorically, grouping the documents by FOIA Request to which they are responsive.[112]

While true that the Navy's response to plaintiffs' second administrative appeal provides additional explanation for the documents it withheld, the specific paragraphs addressing foreseeable harm are lacking. Consider, for example, the Navy's explanation with respect to FOIA Request 1:

> Revealing the DON's and its Consultant's internal deliberation process for evaluating this MORA loan request (discretionary decision) will disrupt the decision-making process and cause a chilling effect on

---

[107] R. Doc. No. 21, at 9–10 ("The Navy's memorandum supporting its summary-judgment motion does not even acknowledge the foreseeable harm requirement, much less demonstrate that the Navy has satisfied that requirement.").

[108] *Id.* at 10.

[109] R. Doc. No. 23, at 2.

[110] *Id.* at 3.

[111] *See* R. Doc. No. 20-2, at 105 (Exhibit 8 to the Declaration of Atina Hall).

[112] *See id.* at 127–29.

open and candid discussion among DON's personnel, its consultants, and attorneys, especially when litigation is forthcoming.

The opinions of each of DON's employees, consultant and attorneys should not be made public.[113]

Its foreseeable harm explanation with respect to FOIA Requests 2 and 8 are similarly bare:

Request 2- . . . If disclosure is required this will cause a foreseeable harm to the agency and will disrupt the decision-making process and cause a chilling effect on open and candid discussion among the DON employees, its consultants, and attorneys. The opinions of each of DON employee, its Consultant and attorneys should not be made public.[114]

. . .

Request 8- . . . If disclosure of this deliberative process is required, this will cause a foreseeable harm to the agency and will disrupt the decision-making process.[115]

These explanations are nothing more than perfunctory, speculative assertions that disclosure would harm the processes the privilege is meant to protect. *Compare Jud. Watch, Inc.*, 375 F. Supp. 3d at 100 (finding the agency's "general explanations of the possibility of a 'chilling effect' f[e]ll short of articulating" the required "link between the specified harm and specific information contained in the material withheld") *and Reps. Comm. for Freedom of the Press v. United States Customs & Border Prot.*, 567 F. Supp. 3d 97, 123 (D.D.C. 2021) (finding perfunctory and insufficient to demonstrate foreseeable harm the agency's statement that "[d]isclosing th[e] information would undermine the deliberative process privilege

---

[113] R. Doc. No. 20-2, at 127.
[114] *Id.* at 128.
[115] *Id.*

42

and the attorney-client privilege, and would have a chilling effect on communication between agency employees who regularly process FOIA requests"), *with Amiri v. Nat'l Sci. Found.*, 664 F. Supp. 3d 1, 15 (D.D.C. 2021), *aff'd*, No. 21-5241, 2022 WL 1279740 (D.C. Cir. Apr. 28, 2022) (finding sufficiently precise the agency's description of the documents as "analyses and recommendations" that "represent 'just two sets of information considered' when [the agency] makes grant decisions," a process in which the agency decision-makers "rely on full candor to continue [the agency's] 'gold standard' for vetting grant proposals") *and Energy Pol'y Advocs. v. Sec. & Exch. Comm'n*, 699 F. Supp. 3d 56, 65 (D.D.C. 2023) ("According to the declaration, [agency] staff would be 'reluctant to record their views and engage in open discussion during the rule drafting process' if they knew that FOIA requests might expose these off-the-cuff conversations. . . . [A]s the declaration explains, avoiding any chilling effect is particularly important when deliberations involve 'controversial proposals and sensitive topics' that benefit from open and expansive discussion on 'all aspects of the proposal' including any 'differing viewpoints.'").

While at times the "very context and purpose" of the withheld records may make "the foreseeability of harm manifest," the record before the Court shows "no obvious reason why disclosing these records would create [the] foreseeable harm" that the deliberative process privilege is aimed to prevent. *Freedom of the Press*, 3 F.4th at 372; *cf. id.* ("With respect to the [then-FBI Director] Comey emails, the record establishes the unique sensitivity of discussions among Director Comey and high-ranking FBI officials about how to respond to an ongoing crisis that threatened

existing covert Bureau operational tactics. The very context and purpose of those communications bearing on sensitive undercover operations in the midst of a policy crisis make the foreseeability of harm manifest."); *Rudometkin v. United States*, 140 F.4th 480, 493 (D.C. Cir. 2025) ("In this case, the records relate to discussions and deliberations concerning a particularly sensitive personnel decision – the selection of a Chief Trial Judge by the Secretary of Defense with input from subordinates – which makes the foreseeability of harm from disclosure manifest.") (citation modified); *Energy Pol'y Advocs.*, 699 F. Supp. 3d at 66 ("The 'context and purpose' of the withheld messages strongly supports a finding of foreseeable harm. Text messages containing internal informal discussions about proposed rulemaking arguably 'lie at the core of the deliberative-process privilege.'"); *Ctr. for Immigr. Stud. v. U.S. Citizenship & Immigr. Servs.*, 766 F. Supp. 3d 1, 12 (D.D.C. 2025) ("A public spotlight on highly politicized and delicate foreign policy questions would cast a pallor over deliberations. It may tempt bureaucrats to issue politically expedient advice rather than provide honest consultation.").

As just one example, Document 2 purports to contain "discussions between NAVFAC SE, NAVFAC LANT PPV employees and TCG regarding possible scenarios under which a loan from [Navy] controlled Accounts could be granted to [LNFH] to cover the cost of insurance premiums."[116] Document 2 also contains "TCG's draft of a proposed answer to be evaluated by NAVFAC PPV personnel."[117] The document is

---

[116] R. Doc. No. 20-2, at 138.
[117] *Id.*

responsive to Request 1.[118] Absent from the record is any explanation of the role these "possible scenarios" play in the Navy's process for deciding whether to release MORA funds and whether they represent opinions of possible scenarios that require candor or represent more benign, objective opinions as to what possibilities are available. While the Court found this description sufficient to establish the deliberative process privilege applies to this document,[119] this description coupled with the boilerplate foreseeable harm explanation is not enough to establish that its disclosure will foreseeably chill agency deliberations. FOIA's foreseeable harm requirement demands more of the Navy. *See Jud. Watch, Inc.*, 375 F. Supp. 3d at 101 ("If the mere possibility that disclosure discourages a frank and open dialogue was enough for the exemption to apply, then Exemption 5 would apply whenever the deliberative process privilege was invoked regardless of whether disclosure of the information would harm an interest protected by the exemption.").

Although the Court finds that the Navy has not satisfied its summary judgment burden, the Court will not, as plaintiffs request,[120] grant summary judgment to plaintiffs on this record. Instead, the Court will allow the Navy the

---

[118] *Id.*

[119] *See supra* p. 37–38.

[120] R. Doc. No. 21, at 3 ("If, however, the Court agrees with Plaintiffs that the Navy has not met its burden under FOIA, the Court can, and should, grant summary judgment to Plaintiffs under Federal Rule of Civil Procedure 56(f)(1) (after providing the Navy with notice and reasonable time to respond).").

opportunity to supplement the record with respect to the foreseeable harm component.[121]

## IV. CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that defendant's motion for summary judgment is **HELD IN ABEYANCE.**

**IT IS FURTHER ORDERED** that the defendant shall supplement its *Vaughn* index with respect to Documents 4–5, 7–11, 13–14, 16, 22–23, 25, 31–32, 36, 38–50, 65, 76, 80, 3P(a), 6P–8P, and 10P–11P by **September 22, 2025**.

**IT IS FURTHER ORDERED** that the defendant shall supplement the record with respect to foreseeable harm by **September 22, 2025**.

**IT IS FURTHER ORDERED** that plaintiffs shall respond to the supplemental materials by **September 29, 2025.**

New Orleans, Louisiana, September 8, 2025.

_____

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

---

[121] The Court notes that the Navy makes no attempt to argue that it has met its burden with respect to foreseeable harm for either Exemption 4 or 6. *See generally* R. Doc. Nos. 20, 23.