**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

**NEW ORLEANS NAVY
HOUSING, LLC, ET AL.**                                                CIVIL ACTION

**VERSUS**                                                                    No. 25-363

**UNITED STATES
DEPARTMENT OF NAVY**                                          SECTION I

<u>**ORDER AND REASONS**</u>

Before the Court is defendant United States Department of Navy's (the "Navy" or "DON") motion[1] for summary judgment. Plaintiffs New Orleans Navy Housing, LLC ("NONH") and Louisiana Navy Family Housing, LLC ("LNFH") (collectively, "plaintiffs") filed a response[2] in opposition. The Navy filed a reply.[3]

On September 8, 2025, having reviewed the parties' briefs, the Court ordered the Navy to supplement its *Vaughn* index with respect to Documents 4–5, 7–11, 13–14, 16, 22–23, 25, 31–32, 36, 38–50, 65, 76, 80, 3P(a), 6P–8P, and 10P–11P and supplement the record with respect to foreseeable harm by September 22, 2025.[4] The Court also ordered plaintiffs to file a response to the supplemental materials by September 29, 2025.[5] The parties timely filed their supplemental materials and briefs.[6]

---

[1] R. Doc. No. 20.
[2] R. Doc. No. 21.
[3] R. Doc. No. 23.
[4] *See* R. Doc. No. 24, at 46.
[5] *See id.*
[6] *See* R. Doc. Nos. 25–26.

1

Having reviewed the supplemental materials and briefs, the Court also ordered the Navy to produce for *in camera* review unredacted versions of Documents 23, 45, 76, 7P, 10P, and 11P. For the reasons set forth below, the Court grants the Navy's motion for summary judgment.

## I.    BACKGROUND

This order and reasons assumes familiarity with the factual background to this dispute, as set out in the Court's first order and reasons with respect to the Navy's motion for summary judgment.[7] As is relevant to the present order and reasons, recall that plaintiffs submitted a FOIA request seeking the following nine categories of documents (the "FOIA request"):

> 1. All documents generated since February 1, 2023 between or among Navy personnel and the Concourse Group that relate to discussions or negotiations between and among NONH, LNFH, Patrician[8] and the Navy with respect to the cost of or funding for insurance premiums for the Project.
>
> 2. All documents generated since February 1, 2023 that discuss the development of the Navy letter dated May 30, 2023 and the transmission of that letter to LNFH dated May 30, 2023 which the Navy labelled as a "Letter of Dissatisfaction".
>
> 3. All documents generated since February 1, 2023 that discuss the reasons for Navy's decision to travel to Louisiana to review books and records of NONH in July and August 2023.
>
> 4. All documents generated since February 1, 2023 to or from Concourse Group that discuss or relate to the Navy's review of books and records of NONH in July and August 2023.

---

[7] *See generally* R. Doc. No. 24.
[8] Patrician Management, LLC is the property manager for the project. *See* R. Doc. No. 21-2, a 1.

5. All documents that discuss or relate to the results or findings of the Navy review books and records of NONH in in July and August 2023.

6. All documents generated by the Concourse Group since February 1, 2023 that suggest, recommend, reference in any manner or comment on whether or not or under what terms to release funds from the Project Member Operating Reserve Account ("MORA") to cover insurance premium costs.

7. All documents that discuss the subsidy implemented through the National Defense Authorization Act ("NDAA") for 2018, pursuant to which the Navy provided certain funds to purportedly counteract the reductions to the Basic Allowance for Housing that were implemented through the NDAA for 2015, and specifically, all documents that discuss and determine that the subsidy, in whole or part, shall be deposited into the Project's MORA.

8. All documents that discuss the 2021 Property Management Incentive Fee request submitted by NONH on or about February 10, 2023, including but not limited to documents used by the Navy in the evaluation of that request and documents between the Concourse Group and the Navy that refer to or relate in any way to that request or the evaluation of that request.

9. All documents that discuss or refer to the release in 2021 of approximately $3,253,243 of funds from the Project Recapitalization Fund ("PRF") to NONH, including but not limited to any documents that relate or refer to any written terms that govern how those disbursements were to be handled or any future replenishment or repayment of any portion or all of those disbursements, which the Navy has claimed were "loans" and required a "loan repayment agreement" "within 90 days".[9]

It should also be remembered that the parties' relationship concerns a public-private venture ("PPV") military housing project (the "NONH project" or "project") that was created pursuant to the Military Housing Privatization Initiative

---

[9] R. Doc. No. 24, at 6–7. For ease of reference, hereinafter each request will be referred to by number. For example, the first category of documents requested in plaintiffs' FOIA request will be referred to as "FOIA Request 1."

("MHPI").[10] The parties' roles and responsibilities with respect to the project are memorialized in the Operating Agreement ("OA") that formed NONH.[11] Additionally, Congress requires the Navy to oversee the financial health and performance of the project.[12]

The Naval Facilities Engineering Systems Command ("NAVFAC") is responsible for the execution and oversight of the housing partnerships.[13] Tom McKelvey ("McKelvey") is the Navy's Business Account Manager ("BAM") with respect to the NONH project, and he is responsible for overseeing the NONH project.[14] The Concourse Group ("TCG") is the Navy's consultant on MHPI-related matters, including all matters concerning NONH with respect to plaintiffs' FOIA request.[15]

## II.    LAW AND ANALYSIS

### 1.    Supplemental *Vaughn* Index

In response to the Court's order to supplement its *Vaughn* index with respect to the documents identified by the Court, the Navy, instead, supplemented the entire *Vaughn* index.[16] Plaintiffs, in response, argue that the Navy's supplemental *Vaughn* index entries still do not demonstrate that the deliberative process privilege applies to the documents that the Court identified as deficient.[17] The Court will only evaluate

---

[10] *See id.*, at 2.
[11] *See id.*
[12] *See id.* at 4.
[13] R. Doc. No. 20-3, at 2.
[14] R. Doc. No. 20-2, at 105; *see also* R. Doc. No. 24, at 4.
[15] *Id.* at ¶¶ 51–52.
[16] *See generally* R. Doc. No. 25.
[17] *See generally* R. Doc. No. 26.

whether the deliberative process privilege applies with respect to those documents previously identified as deficient, and, for ease of review, it will evaluate the documents as grouped by plaintiffs.[18]

Recall that the deliberative process privilege protects from disclosure "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *United States Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 267 (2021). The privilege typically covers documents that "reflect the personal opinions of the writer rather than the policy of the agency," but not documents containing purely "factual material that does not reveal the deliberative process." *Batton*, 598 F.3d at 183.

To be exempt from disclosure pursuant to the deliberative process privilege, the documents must be both "predecisional" and "deliberative." *Sierra Club*, 592 U.S. at 268; *Gahagan v. United States Citizenship & Immigr. Servs.*, 147 F. Supp. 3d 613, 629 (E.D. La. 2015) (Vance, J.). "Documents are 'predecisional' if they were generated before the agency's final decision on the matter, and they are 'deliberative' if they were prepared to help the agency formulate its position." *Sierra Club*, 592 U.S. at 268; *see also Jobe*, 1 F.4th at 408 ("Predecisional documents include those 'generated

---

[18] With respect to each group of documents, plaintiffs reurge their argument that the documents do not "implicate a policy-oriented judgment." *See, e.g.*, R. Doc. No. 26, at 12, 13, 14. Because the Court has already rejected plaintiffs' argument that these documents should be categorically excluded because the decisions to which they pertain arise from the parties' contractual relationship, *see* R. Doc. No. 24, at 27, it will not re-address those arguments in this order and reasons.

before the adoption of an agency policy.' Deliberative ones 'reflect the give-and-take of the consultative process.'" (internal citations omitted) (quoting *Jud. Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141 (D.C. Cir. 2006))). "An 'agency need not pinpoint a particular final decision to which the material contributed.'" *Ensco Offshore Co. v. Salazar*, No. 10-1941, 2010 WL 11538697, at *8 (E.D. La. Sept. 16, 2010) (Wilkinson, J.) (internal citations omitted).

Documents reflecting an agency's "mundane" deliberative processes fall outside the scope of the privilege. *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1433–34, 1436 n.8 (D.C. Cir. 1992).

*Documents 45 and 6P*: Plaintiffs argue that Document 45, and Document 6P because it is a duplicate of Document 45, do not fall within the deliberative process privilege because, among other reasons, it is unclear whether these documents are predecisional.[19] Plaintiffs also accuse the Navy of withholding the documents merely because it was concerned that "disclosing the employee's 'candid opinion' could be embarrassing."[20]

Document 45 is an email from a NAVFAC SE employee to McKelvey that the Navy states was generated in its deliberations regarding the 2021 Property Management Incentive Fee ("PMIF") request.[21] The email is described as containing "[i]nternal discussion on whether the DON should deny LNFH direct contact with NAVFAC SE's legal counsel since the entity is represented by counsel on the matter

---

[19] *See* R. Doc. No. 26, at 12.
[20] *Id.*
[21] *See* R. Doc. No. 25-1, at 18.

6

to be discussed," as well as a "candid opinion of [the] employee . . . for the reasons behind the request by [LNFH]."[22] In the foreseeable harm column, the Navy states that "[r]elease of an employee[']s candid opinion on a particular issue related to LNFH's motives to dispute all of DON's decision[sic] will negatively affect the willingness of agency [personnel] to engage in forthright discussions and would discourage employees from honestly reporting concerns, thereby lowering the quality of DON's oversight and agency decisions."[23]

The Court reviewed Document 45 *in camera*.[24] Based on the *Vaughn* index and the Court's *in camera* review, the Court finds that the deliberative process privilege applies to this document.

_Document 7P_: Plaintiffs raise similar arguments with respect to this document as they did for Document 45. This document is an email, and it is described as containing "[i]nternal discussions regarding [plaintiffs'] request to review DON's data on the 2021 Incentive Fee and the employee[']s candid opinion of this request. This document also includes communications exchanged between the DON and LNFH dated 8-10-23; 8-31-2[sic]."[25] The Navy represents that this email relates to FOIA

---

[22] *See id.*
[23] *Id.*
[24] *See* R. Doc. No. 28, at 2.
[25] *See* R. Doc. No. 25-1, at 28.

Request 8, which sought the documents related to the 2021 PMIF that the project submitted around February 10, 2023.[26]

Plaintiffs argue, among other things, that the email is post-decisional because it is dated September 1, 2023, and the Navy has represented elsewhere that the decision with respect to the 2021 PMIF was made by April 12, 2023.[27]

Plaintiffs' point is well-taken; a record must be "generated before the agency's final decision on the matter" to fall within the ambit of the deliberate process privilege, *Sierra Club*, 592 U.S. at 268, and "[t]he timing of a record is important in th[at] analysis," *Nat'l Right to Work Legal Def. & Educ. Found., Inc. v. U.S. Dep't of Lab.*, 828 F. Supp. 2d 183, 189 (D.D.C. 2011). However, the Supreme Court has made clear that the "emphasis on the need to protect pre-decisional documents does not mean that the existence of the privilege turns on the ability of an agency to identify a specific decision in connection with which a memorandum is prepared." *N. L. R. B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 n. 18 (1975); *see also Sierra Club, Inc.*, 592 U.S. at 272 (quoting *Sears*, 421 U.S. at 153 n. 18) ("'[C]ourts should be wary of interfering' with drafts that 'do not ripen into agency decisions'"). "[I]t is enough that the record is connected to 'a specific decisionmaking process." *See Project S. v. United States Immigr. & Customs Enf't*, No. 121-08440, 2024 WL 1116164, at *9 (S.D.N.Y. Mar. 12, 2024) ("The agency need not point to a specific decision that it was facing for which the document was prepared—it is enough that the record is connected to 'a

---

[26] *See* R. Doc. No. 24, at 7.
[27] *See* R. Doc. Nos. 20-2, at 117; 25-1, at 27–28.

specific decisionmaking process.'"); *see also Ensco*, 2010 WL 11538697, at *8 ("An 'agency need not pinpoint a particular final decision to which the material contributed.'" (internal citations omitted)).

Having reviewed Document 7P *in camera*,[28] the Court finds that the discussion does not, as plaintiffs surmise, "refer[] to the Navy's April 2023 decision on the 2021 Project Manager Incentive Fee,"[29] but instead pertains to the Navy's "continuing process"[30] with respect to the annual PMIF fee as well as the Navy's continuing oversight of the project generally. The Court finds that the Navy's description in the *Vaughn* index coupled with *in camera* review sufficiently demonstrate that the deliberative process privilege applies to this document.

*Documents 10P and 11P*: Plaintiffs take issue with the fact that the descriptions of these documents have changed significantly in the Navy's supplemental *Vaughn* index.[31] For example, Document 10P in the Navy's original *Vaughn* index was described as containing email communications that "reflect the agency's deliberation on LNFH's request of information on OA and Indenture revisions."[32] In the supplemental *Vaughn* index, Document 10P is described as

---

[28] *See* R. Doc. No. 28, at 2.
[29] *See* R. Doc. No. 26, at 13 ("[I]f the discussion of 'LNFH's motives to dispute all of [the Navy's] decision' refers to the Navy's April 2023 decision on the 2021 Project Manager Incentive Fee, then the September 1, 2023 email is post-decisional, not predecisional.").
[30] *See Sears*, 421 U.S. at 153 n. 18.
[31] R. Doc. No. 26, at 13–14.
[32] *See* R. Doc. No. 20-2, at 169.

containing "[i]nternal review to determine if the PRA loan requires adjustments to any business agreements."[33]

Likewise, the original *Vaughn* index described Document 11P as two emails that contained "the agency's deliberation on LNFH and Bondholders representative request for a meeting to discuss revisions to the Project's Indenture Agreement."[34] The supplemental *Vaughn* index describes the emails as containing "discussions between NAVFAC SE Team regarding the steps needed to amend the Trust Indenture and the chain of command approval."[35]

Plaintiffs argue that the fact that "[t]he Navy's description of these documents has shifted so significantly . . . raise[s] serious questions regarding the documents' true contents."[36] They urged this Court to examine the documents *in camera* before granting the Navy summary judgment with respect to these records.[37]

The Court has reviewed both documents *in camera*.[38] The review revealed that the differing document descriptions are consistent with one another and accurately reflect the content of the emails. More importantly, based on the supplemental *Vaughn* index description and the Court's *in camera* review, the Court is satisfied

---

[33] *See* R. Doc. No. 25-1, at 28.
[34] *See* R. Doc. No. 20-2, at 170.
[35] *See* R. Doc. No. 25-1, at 28.
[36] R. Doc. No. 26, at 13.
[37] *See id.* at 14.
[38] *See* R. Doc. No. 28, at 2.

that the Navy has met its burden of demonstrating that the deliberative process privilege applies to these documents.

_Documents 65 and 80_: In its original order and reasons, the Court determined that it was "unclear" based on the original _Vaughn_ index "whether these documents precede the decision to which they purportedly pertain."[39] Plaintiffs essentially argue that the Navy's supplemental _Vaughn_ index does not sufficiently cure this deficiency.[40]

Document 80 is an email containing a NAVFAC SE employee's "discussion on [the] PRA loan and LNFH's intent to dispute DON's decision to provide funding for [Hurricane] IDA repairs as a PRA loan and dispute loan provided to cover [Hurricane] ZETA repairs after receipt of funding and oral agreement [was] reached."[41] The foreseeable harm column states that the email is responsive to FOIA Request 9, which sought documents related to the 2021 PRF release of funds.[42] The email is dated January 4, 2022.[43] Plaintiffs argue that this clearly demonstrates that the document is post-decisional.[44] The Court disagrees.

Although the decision to release the PRF funds in 2021 clearly predates this 2022 email, the foreseeable harm column makes clear that the email was generated

---

[39] _See_ R. Doc. No. 24, at 38.

[40] _See_ R. Doc. No. 26, at 14–15.

[41] _See_ R. Doc. No. 25-1, at 26.

[42] _See id._

[43] _See id._

[44] _See_ R. Doc. No. 26, at 14 ("In the revised _Vaughn_ index, the Navy all but concedes that Document 80 is post-decisional and thus not covered by the deliberative process privilege.").

11

as a part of the Navy's process of determining which of the available "possible actions" it would take in response to LNFH's changed position with respect to the 2021 PRF disbursement.[45] It is clear from the record that the parties disagree on whether the 2021 PRF disbursement was a loan that LNFH had agreed to repay.[46] If the Navy believes that the parties had agreed that the disbursement was a loan to be repaid, LNFH's position that it will challenge that agreement requires the Navy to deliberate, in the context of its ongoing financial oversight role of the project, how to respond.

The Navy has sufficiently explained its oversight role over the project and its continuing responsibility to make deliberative decisions to preserve the financial health of the project.[47] The Court finds this updated description of Document 80 clearly connects the email to "a specific decisionmaking process." *See Project S.*, 2024 WL 1116164, at *9; *see also Ensco*, 2010 WL 11538697, at *8 ("An 'agency need not pinpoint a particular final decision to which the material contributed.'" (internal citations omitted)).

The same goes for Document 65, which is described as an email from McKelvey that contains "[i]nternal discussion regarding change of position of LNFH not to repay

---

[45] *See* R. Doc. No. 25-1, at 26 ("Should the withheld documents be released it would reduce the flow of honest, diverse opinions and will impair the agency's ability to fully weigh the merits and drawbacks of possible actions.").

[46] *See, e.g.*, R. Doc. No. 21, at 5 ("The Navy characterizes the disbursement as a 'loan' that LNFH had agreed to repay; LNFH disputes that any such repayment agreement existed."); R. Doc. No. 20-3, at 13 ("In 2021, [LNFH] and the DON agreed that disbursement of PRF sums was conditioned on the replenishment of the PRF.").

[47] *See generally* R. Doc. No. 20.

disbursement of PRA funds."[48] Like Document 80, this email relates to the 2021 PRF disbursement.[49] The new foreseeable harm section similarly explains that this email was generated during the Navy's process of determining "possible actions" to take in response to LNFH's alleged "change of position" with respect to the 2021 PRF disbursement.[50] The Court does not agree with plaintiffs that this description fails because "it is unclear to what yet-to-be-finalized decision the Navy contends this document relates."[51] Like the Court found with respect to Document 80, the Court also finds that Document 65 sufficiently relates to the Navy's deliberative processes with respect to its oversight role of the project, such that the Navy has met its burden of demonstrating that the deliberative process privilege applies.

_Documents 4, 5, 7, 9, 13-14, 22 and 4P:_ Plaintiffs contend that these documents—which are all described as containing "discussion on topics discussed during meeting[s]" and the Navy's "steps moving forward"—describe only factual material or are post-decisional such that these documents fall outside of the deliberative process privilege.[52] The Court disagrees.

Having reviewed each of the _Vaughn_ index entries with respect to these Documents, the Court finds that the supplemental _Vaughn_ index sufficiently clarifies

---

[48] R. Doc. No. 25-1, at 23.

[49] _See id._ (explaining that the email is responsive to FOIA Request 9).

[50] _See id._ ("Documents withheld reflect the opinions of DON employees and do not reflect the Agency's final decision. Should the withheld documents be released it would reduce the flow of honest, diverse opinions and will impair the agency's ability to fully weigh the merits and drawbacks of possible actions.").

[51] _See_ R. Doc. No. 26, at 15.

[52] _See id._ at 15–16.

the content of these documents and cures the errors identified by the Court in its first order and reasons.[53] It is clear to the Court that these documents contain the Navy's post-meeting, *pre*-decisional deliberations regarding the parties' disagreement with respect to how to fund the increased insurance premiums,[54] as well as proposed steps needed to move forward after those meetings[55] in order to reach a final decision with respect to the insurance premiums.[56] Accordingly, the Court finds that the Navy has demonstrated that the deliberative process privilege applies to these documents.

<u>*Document 23:*</u> Like plaintiffs' arguments with respect to Documents 10P and 11P, plaintiffs contend that the "shifting description" with respect to Document 23

---

[53] *See* R. Doc. No. 24, at 34–35.

[54] Documents 4, 5, 7, 9, 13–14, and 22 all relate to FOIA Request 1, which sought documents related to discussions or negotiations regarding the cost of or funding for insurance premiums for the project. *See* R. Doc. No. 25-1, at 6–9, 12; *see also* R. Doc. No. 24, at 6.

[55] *See, e.g.*, R. Doc. No. 25-1, at 7 (Document 7) (describing the email from TCG as including "the Agency's steps moving forward").

[56] The Court is not persuaded by plaintiffs' argument that Document 22 confirms that the email is post-decisional because it is dated August 10, 2023, and it is described as pertaining to a meeting held on August 4, 2023 and containing "a copy of [a] communication sent by the DON to LNFH on 8-9-23 relaying its decision to LNFH." *See* R. Doc. No. 25-1, at 12. The document description makes clear that this "decision" sent by the DON refers to the Navy's "rejection of [LNFH's] proposed sunset provision in the OA." *See id.* It does not follow that the discussions in the August 10th email do not pertain to further, pre-decisional discussions as to how to resolve the ongoing negotiations with respect to the insurance premiums in light of the August 9th rejection communication and August 4th meeting.

"raises significant concerns" about the document's true contents and "severely impede[s] [their] ability to challenge the bases for the Navy's withholding."[57]

Document 23 was previously described as containing the "notes, input and the opinion of Tom McKelvey of what transpired during a meeting with LNFH officers and their attorney. It also provides DON's steps moving forward. Additionally, the document includes internal deliberation on litigation risk."[58] The supplemental *Vaughn* index now describes the email as containing "[i]nternal discussion of the emails exchanged with LNFH's principal, Alex Lewis, on 5-2-23 and 5-5-23 and discuss[ion of] the agency's internal decision on who should process the request and why. Discussion of need to request an analysis from TCG regarding discussion points in preparation for phone call with LNFH and recommendations."[59]

Plaintiffs aver that the significant change to Document 23's description in the supplemental *Vaughn* index is not only suspicious but also fails to demonstrate that the deliberative process privilege applies.[60] For one thing, the supplemental description does not elaborate the reference to "process[ing] the request."[61]

Like the Court's assessment of Documents 10P and 11P, *in camera* review revealed that the differing document descriptions were consistent with one another and accurately describe the contents of the emails. The Court is satisfied based on its

---

[57] *See* R. Doc. No. 26, at 16.
[58] *See* R. Doc. No. 20-2, at 145.
[59] *See* R. Doc. No. 25-1, at 12.
[60] *See* R. Doc. No. 26, at 16–17.
[61] *See id.* at 16.

*in camera* review of Document 23 that the deliberative process privilege applies to this document.[62]

   *Remaining Documents 8, 10, 11, 16, 25, 31–32, 36, 38–44, 46–50, 76, 3P, 8P*: Plaintiffs do not raise specific arguments with respect to the remaining documents identified in the Court's order and reasons as deficient.[63] Nevertheless, the Court has independently reviewed each of the *Vaughn* index entries for these documents and finds that the Navy has demonstrated that the deliberative process privilege applies to all remaining documents, except for Documents 40, 41, and 76, which invoke the attorney-client privilege.[64]

   Documents 40 and 41 are duplicates. The *Vaughn* index explains that the document is an email chain between a NAVFAC employee and NAVFAC legal

---

[62] *See* R. Doc. No. 28, at 2.

[63] *See generally* R. Doc. No. 26.

[64] *See* R. Doc. No. 25-1, at 17. Plaintiffs argue in their supplemental response that the Court should not consider the Navy's invocation of the attorney client privilege because it was not briefed by counsel. *See* R. Doc. No. 26, at 19–20 (arguing that the Navy should not be allowed "to inject new legal bases for withholdings at this late stage—and especially not to do so only through a declaration of a non-lawyer witness"). Plaintiffs also reference this Court's previous order and reasons stating that, "the Navy's success in invoking Exemption 5 rises and falls with its ability to establish that the deliberative process privilege applies to each withheld document" to suggest that the Court has already determined that the Navy may not invoke the attorney client privilege. *See id.* at 20. Plaintiffs misread this Court's order and reasons. The Court's determination that "the Navy's success in invoking Exemption 5 rises and falls with its ability to establish that the deliberative process privilege" was based on the Navy's lack of support that the attorney-client privilege was applicable, both in the Navy's briefing and in the *Vaughn* index. *See* R. Doc. No. 24, at 17–18 ("The Navy additionally invokes the attorney-client privilege and attorney work product privilege for a handful of documents, but, as plaintiffs point out, it makes no attempt to support its assertion of these additional privileges in its briefing. *More importantly*, the Navy's description with respect to these documents is conclusory and cannot carry its summary judgment burden of demonstrating that the

counsel, Luke Killam.[65] The email chain is described as: "[a] [r]equest to NAVFAC SE legal counsel to interpret a contract definition and provide legal assessment. Response provided by attorney. Additional email exchanges between client/attorney on contract interpretation provided."[66]

As for Document 76, the *Vaughn* index describes it as an email chain that contains "[i]nternal discussion of matrix of open items and status and extrajudicial claim; NAVFAC LANT request to NAVFAC SE attorneys to evaluate NONH business agreement in light of LNFH's attorneys' letter and the response provided by attorney Luke Killam."[67] The email chain is also described as including "a copy of email communication exchanged with LNFH's legal counsel dated 7-5-23 with a matrix of open items and status and a letter."[68] The Court reviewed Document 76 *in camera*.[69]

To invoke the attorney-client privilege, "the agency 'must show that the withheld document (1) involves confidential communications between an attorney and [the agency] and (2) relates to a legal matter for which the [agency] has sought

---

attorney-client privilege or attorney work product privilege applies." (emphasis added)). Despite plaintiffs' suggestion, this is not a "new legal basis" for the withholdings that the Navy has waived. *See* R. Doc. No. 20-2, at 47–48 (the Navy's second response to plaintiffs' FOIA request, invoking the attorney-client privilege with respect to Documents 40, 41, and 76); *see also id.* at 151, 161 (the Navy's original *Vaughn* index, invoking the invoking the attorney-client privilege with respect to Documents 40, 41, and 76). The Court finds it proper to consider whether the Navy's *Vaughn* index and the declaration of Tom McKelvey sufficiently demonstrate that the attorney-client privilege is appliable to these documents.

[65] *See* R. Doc. No. 25-1, at 17.

[66] *See id.*

[67] *See id.* at 25.

[68] *See id.*

[69] *See* R. Doc. No. 28, at 2.

professional advice.'" *Gahagan*, 147 F. Supp. 3d at 629 (quoting *Judicial Watch, Inc. v. U.S. Dep't of Treasury*, 796 F.Supp.2d 13, 33 (D.D.C. 2011)). By these metrics, the Court finds that the Navy has demonstrated that the attorney-client privilege applies to these email chains because the primary purpose of the communications at issue was to seek counsel's legal advice. *See Slocum v. Int'l Paper Co.*, 549 F. Supp. 3d 519, 524 (E.D. La. 2021) (Fallon, J.) ("In order for attorney-client privilege to apply, legal advice must be the primary purpose of the communication."); *cf. Yankee Atomic Elec. Co. v. United States*, 54 Fed. Cl. 306, 316 (2002) ("[T]he work-product of government attorneys created in anticipation of litigation is protected even if the litigation involves obligations under a statute, regulation, or a contract.").

Accordingly, the Court holds that the Navy has met its burden of demonstrating that Exemption 5 is applicable to all the withheld documents.

## 2.    Foreseeable Harm

Having determined that the Navy has satisfied its burden of demonstrating that Exemption 5 applies to all the withheld documents, the Court must now determine whether the Navy's supplemental materials satisfy FOIA's additional "foreseeable harm" requirement. *See* 5 U.S.C. § 552(a)(8)(A)(I) ("An agency shall . . . withhold information under this section only if . . . the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b)[.]" (emphasis added)); *see also Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 3 F.4th 350, 369 (D.C. Cir. 2021) ("Finding the

deliberative process privilege applicable to some of the withheld materials does not end the matter.").

As the Court noted in its first order and reasons, the requirement applies with "special force" in the deliberative process privilege context. *See Juul Labs, Inc. v. Food & Drug Admin.*, 731 F. Supp. 3d 46, 59 (D.D.C. 2024) (stating that the foreseeable harm requirement "applies with special force to deliberative process withholdings under Exemption 5, given the particular risks of overuse of that privilege." (citation modified)). "In the context of withholdings made under the deliberative process privilege, the foreseeability requirement means that agencies must concretely explain how disclosure 'would'—not 'could'—adversely impair internal deliberations." *Reps. Comm. for Freedom of the Press*, 3 F.4th at 369–70; *Emuwa v. United States Dep't of Homeland Sec.*, 113 F.4th 1009, 1015 (D.C. Cir. 2024). "Agencies cannot rely on mere speculative or abstract fears, or fear of embarrassment to withhold information." *Freedom of the Press*, 3 F.4th at 369 (internal quotations omitted).

To satisfy its burden, the withholding agency must "articulate both the nature of the harm and the link between the specified harm and specific information contained in the material withheld." *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 106 (quoting H.R. Rep. No. 114-391, at 9 (2016)); *see also Reps. Comm. for Freedom of the Press*, 3 F.4th at 370 (finding the government failed to meet its foreseeable-harm burden because "[t]he government broadly failed to 'specifically focus' its foreseeable harm demonstration 'on the information at issue in the documents' under

review" (internal alterations omitted) (quoting *Machado Amadis v. Department of State*, 971 F.3d 364, 370 (D.C. Cir. 2020))).

The agency must provide "context or insight into the specific decision-making processes or deliberations at issue, and how they in particular would be harmed by disclosure" to satisfy its burden. *Id.* at 107; *see also Reps. Comm. for Freedom of the Press*, 3 F.4th at 370 (holding that the agency must demonstrate why disclosure of the withheld material "in the specific context of the agency action at issue, actually impede[s] those same agency deliberations going forward"). Of course, "the agency need not specify its objections to disclosure in such detail as to compromise the secrecy of the information." *Ecological Rts. Found. v. U.S. Env't Prot. Agency*, No. 22-15936, 2023 WL 4342100, at *3 (9th Cir. July 5, 2023). But a justification that is "essentially a restatement of 'the generic rationale for the deliberative process privilege itself'" is fatally flawed. *Americans for Fair Treatment v. United States Postal Serv.*, 663 F. Supp. 3d 39, 60 (D.D.C. 2023).

For this reason, the D.C. Circuit in *Reporters Committee for Freedom of the Press v. Federal Bureau of Investigation* found insufficient the Federal Bureau of Investigation's ("FBI") declaration on foreseeable harm. *See generally* 3 F.4th 350 (D.C. Cir. 2021). The FBI's declaration, which was "contained in just two 'umbrella paragraphs,'" stated that the release of "all of the deliberative information in the case" would "have an inhibiting effect upon agency decisionmaking and the development of policy because it would chill full and frank discussions between agency personnel and decision makers regarding a decision." *See id.* at 370. The court emphasized that the

20

FBI's foreseeable harm explanation "did not explain the particular sensitivity of the types of information at issue or the role that they play[ed] in the relevant agency decisional processes (and, therefore, whether and how their release would harm similar deliberations in the future)." *See id.* at 372. The FBI had "ignore[d] that the agency must specifically and thoughtfully determine whether it 'reasonably foresees that disclosure' of each particular record 'would harm an interest protected by [the] exemption.'" *See id.*

In contrast, the D.C. Circuit in *Emuwa v. United States Department of Homeland Security* found that the Department of Homeland Security ("DHS") had adequately demonstrated foreseeable harm. *See generally* 113 F.4th 1009 (D.C. Cir. 2024). In that case, the withheld material at issue consisted of assessments prepared by United States Citizenship and Immigration Services ("USCIS") officers that had interviewed applicants for asylum. *See id.* at 1014. DHS supported its withholding of the material with a declaration from its Chief FOIA Officer, which "confirmed that the withheld portions contained candid impressions, opinions, and analyses of the evidence and the bases for the recommendations." *See id.* (internal alterations omitted). The declaration also "explained that releasing the specific pre-decisional deliberations at issue would interfere with USCIS's ability to make sound judgments on asylum applications because the line officers would temper their discussions with the knowledge that their views and characterizations would be made public." *See id.* (internal alterations omitted). USCIS's Chief FOIA Officer also stated that "in the specific context of asylum adjudications, revealing the kinds of matters and

21

information that the asylum officers considered would allow bad actors to better fabricate evidence or testimony so that they might be granted asylum under false pretenses." *See id.* (internal alterations omitted).

The D.C. Circuit found this explanation was sufficient because the Chief FOIA Officer had "focused on why release of the 'withheld portions of the four assessments at issue' (not privileged information in general) 'would' (not could) 'interfere with USCIS's ability' to receive candid advice from its line asylum officers." *See Emuwa*, 113 F.4th at 1015. It also found persuasive that the declaration had "laid out contextual considerations tending to support the reasonableness" of her judgment that harm would result, "including the 'sensitive' nature of asylum adjudications and the specific concern about facilitating asylum fraud." *See id.*

Likewise, in *New York Times v. United States Department of Justice*, the Second Circuit found that the United States Department of Justice ("DOJ") had met its burden of showing foreseeable harm with respect to portions of a report it had withheld. *See generally* No. 22-2232, 2024 WL 1109260 (2d Cir. Mar. 14, 2024). The report had been written by an independent monitor who "was tasked with tracking the efforts of [an entity] to comply with a plea agreement arising out of an emissions evasion scheme." *See id.* at *1. The report contained the monitor's "findings, observations, and recommendations concerning various aspects of [the entity's] practices and compliance efforts." *See id.* The Second Circuit credited DOJ's "represent[ation]" that the report contained the monitor's "frank analysis of what must be done for [the plea agreement] implementation to succeed," along with its

statement that "evaluation of a company's adherence to a plea agreement 'depends, in no small part, on the ability of monitors and the DOJ to communicate openly and honestly without concern that such discourse would become public.'" *See id.* at *4 (internal alterations omitted).

In its supplemental materials, the Navy provided a declaration from McKelvey in which he attests that disclosure of the emails at issue "would materially interfere with the Agency's ability to provide proper oversight of [LNFH's] financial operations and Project performance."[70] He goes on to explain that "[r]eleasing the withheld documents would show discussions about the DON's oversight decisions prior to providing guidance to LNFH" and that this "would adversely affect the DON's oversight role [because] proper oversight requires a careful and balanced consideration of all possible arguments and rationales, even those that are ultimately not incorporated in the DON's final decision."[71] He further predicts that, if the materials were deemed releasable under FOIA, it "would effectively mean that the DON would have to conduct nearly all its oversight operations via face-to-face meetings rather than via e-mails or other written communication in order to keep predecisional communications confidential."[72]

In addition to McKelvey's overarching foreseeable harm declaration, the Navy's updated *Vaughn* index now contains revised descriptions of each record which "give[] new context to all responsive records and the foreseeable harm in releasing

---

[70] *See* R. Doc. No. 25-1, at 3.

[71] *See id.*

[72] *See id.*

the same."[73] There is now a foreseeable harm column containing a foreseeable harm description for each withheld document, tailored to the subject matter of the withheld document. The updated *Vaughn* index now also includes columns that set forth the "type" of document, the "date" of the document, and the author and recipients of each email in the documents.[74] Like the Navy's previous *Vaughn* index, the updated index lists which of plaintiffs' nine requests the document is responsive to,[75] as well as the FOIA exemption invoked as to each.[76]

Measured against the benchmarks elucidated from the cases cited above, the Court finds that the Navy's supplemental materials satisfy its foreseeable harm burden for each of the withheld documents. All the withheld records are emails, email chains, or emails with attachments. Each entry of the *Vaughn* index describes in detail the "specific information contained" in the emails, and links that information to a specific, tailored foreseeable harm justification. *See Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 106. Every email is described as containing either the "internal discussion[s]," "thoughts," "opinion[s]," and/or "recommendations" of McKelvey, employees and members of the NAVFAC SE team, and/or TCG, and each email was generated in the context of the Navy's deliberations regarding project decisions and project oversight. As for the nature of the harm, each entry explains how release of the specific emails would result in a foreseeable harm that Exemption

---

[73] R. Doc. No. 25-1, at 1; *see also id.* at 5–28 (containing a new "Foreseeable Harm" column).

[74] *See generally* R. Doc. No. 25-1, at 5–28.

[75] *See* R. Doc. No. 24, at 6–7.

[76] *See generally* updated *Vaughn* index.

5 protects against; for example, entries in the *Vaughn* index state that release will "chill . . . staff candor" and/or "negatively affect the willingness of agency personnel to engage in forthright discussions and would discourage employees from honestly reporting concerns, thereby lowering the quality of DON's oversight and agency decisions."

Moreover, as the Court recognized in its first order and reasons, these decisions "are ones in which the Navy exercises considerable discretion, and that arise in part from Congress' mandate that the Navy oversee the financial health of its MHPI projects."[77] Indeed, as the Navy alludes to in many of its *Vaughn* index entries, these decisions do not implicate only the Navy's oversight role of *this* MHPI project—revealing the Navy's internal discussions with respect to these decisions "would reveal the [Navy's] . . . internal financial reasoning, . . . [and] weaken[] the government's ability to negotiate or enforce repayment and potentially signal[] unapproved strategies to outside parties," such as the Navy's other MHPI projects.[78] As another *Vaughn* index entry states, release of the withheld documents "would risk the agency's ability to conduct comprehensive and robust internal debate on proper use of funds and safeguard against waste or mismanagement by private housing providers."[79] In this context, the Court finds that the Navy has met its foreseeable harm burden and sufficiently supported its withholding of each document under Exemption 5.

---

[77] *See* R. Doc. No. 24, at 28.
[78] *See, e.g.*, R. Doc. No. 25-1, at 10 (Document 19, Foreseeable Harm).
[79] *See id.* at 5 (Document 2, Foreseeable Harm).

The Court will not transcribe its analysis of each of the ninety-five documents within this order and reasons, but the *Vaughn* index entry for Document 17 illustrates the Court's reasoning.

Document 17 is an email chain generated in the context of FOIA Request 1, which sought documents related to the Navy's decision with respect to LNFH's request for funding to cover increased insurance premiums.[80] The first email is from McKelvey to NAVFAC SE, NAVFAC LANT, CSO team, and TCG discussing the "[p]roject's inability to cover insurance renewal premium cost due to insufficient funds in their accounts," "LNFH['s] unwillingness to reduce operating budget expenses," and a "proposal to use [the] Project's [M]ORA account funds to pay for the cost of insurance premium[s]."[81] The second email is from an unnamed NAVFAC LANT employee that discusses the employee's "position on LNFH's request and rationale [they] used."

With respect to foreseeable harm, the *Vaughn* index entry for Document 17 states: "Documents withheld reflect the opinions of agency employees and do not reflect the agency's final decision. Release will negatively affect the willingness of agency personnel to engage in forthright discussions and would discourage employees from honestly reporting concerns, thereby lowering the quality of DON's oversight and agency decisions."[82] Coupled with McKelvey's declaration that the Navy relies on candid discussion to reach decisions with respect to its oversight role, the Court finds

---

[80] *See* R. Doc. No. 25-1, at 10 (Document 17).

[81] *See id.*

[82] *See id.*

that the Navy has sufficiently supported its judgment that the foreseeable harm would result if these emails were released.

Plaintiffs disagree that the Navy has satisfied its foreseeable harm burden.[83] They lodge a handful of arguments to undermine the Navy's showing of foreseeable harm that the Court finds are without merit. For example, plaintiffs take issue with the fact that many of the foreseeable harm entries are "nearly identical" to one another.[84] But this makes sense given the fact that many of the emails were generated in the context of the same decisions—indeed, FOIA contemplates category-by-category foreseeable harm justifications for documents that are sufficiently similar. *See Rudometkin v. United States*, 140 F.4th 480, 493 (D.C. Cir. 2025). The Court will not penalize the Navy for taking a more thorough document-by-document approach, because its similar justifications are sufficient when read together with the detailed document description each justification is coupled with. *See Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 106–07 (D.D.C. 2019) (finding troublesome the agency's *Vaughn* index foreseeable harm descriptions that recite the same justification with "only slight variation," but also holding that these same descriptions "may be enough" once coupled with "more detailed document description[s]").

Plaintiffs also broadly state that "McKelvey's insistence on the necessity of secrecy in his office's oversight operations is in considerable tension with the

---

[83] *See* R. Doc. No. 26, at 4 ("Neither McKelvey's new declaration nor the revised Vaughn index comes close to satisfying that burden.").
[84] *Id.* at 4.

'presumption of openness' underlying" FOIA.[85] But, as the Fifth Circuit has made clear, "FOIA expressly recognizes that important interests are served by its exemptions, and those exemptions are as much a part of FOIA's purposes and policies as the statute's disclosure requirement." *Jobe v. Nat'l Transp. Safety Bd.*, 1 F.4th 396, 402 (5th Cir. 2021). While FOIA's policy of openness remains an important factor in this Court's analysis, the Court will not exclude documents it has held fall within Exemption 5's protection merely because plaintiffs contend that the secrecy inherent in withholding materials is inconsistent with the general policy of FOIA.

Plaintiffs also argue that "the Court should not grant summary judgment to the Navy on a chilling-effect rationale because the Navy has never supported that claim with declarations from subordinate personnel whose communications allegedly would be chilled."[86] It makes a similar argument with respect to the communications from TCG: "Despite having multiple opportunities, the Navy has not provided a declaration from its consultant, Matt Brookman, stating that he would have shirked his contractual duty to provide objective advice to the Navy had he known that his communications might be subject to disclosure under FOIA."[87]

While declarations from Navy personnel would certainly bolster McKelvey's judgment that release will chill these same persons' candor and willingness to give their opinions and recommendations, there is no requirement that foreseeable harm be supported by statements from consultants or "subordinate personnel." *See, e.g.*,

---

[85] *See id.* at 5.
[86] *Id.* at 8.
[87] *Id.*

*Emuwa*, 113 F.4th at 1017 (finding the agency's foreseeable harm justification sufficient based on the declaration of the agency's FOIA officer).[88] McKelvey, as the PPV BAM for NAVFAC SE, is intimately familiar with these conversations and the context of the decisions to which these email discussions pertain.[89] The Court may credit his judgment that release will chill future deliberations when sufficiently supported. *See id.* at 1016 (finding that the agency's FOIA officer's declaration was sufficient to demonstrate foreseeable harm where the court had "no reason to doubt her qualifications or knowledge to provide the supplemental declaration"); *Juul Labs, Inc.*, 731 F. Supp. 3d at 74 ("[A] well-founded assertion by an agency that internal agency deliberations would be chilled by the disclosure is ordinarily sufficient to meet the foreseeable-harm requirement.").

Lastly, plaintiffs argue that the likelihood that a chilling effect would result from release is undermined by the fact that the documents at issue "would be subject to discovery in litigation regarding the government's compliance with its contractual

---

[88] Plaintiffs separately suggest that the Court may not rely on McKelvey's declaration to determine whether the Navy has met its burden with respect to foreseeable harm. *See* R. Doc. No. 26, at 17–19. Instead, it is plaintiffs' contention that the Navy's counsel must brief the issue for it to be considered. *See id.* at 19 ("[G]overnment counsel has not provided any supplemental briefing in support of the Navy's foreseeable-harm argument. . . . Under these circumstances, the Court should not grant summary judgment to the Navy based on the additional materials on foreseeable harm contained in the Navy's Response."). Plaintiffs proffer no caselaw to support their contention that the Court may not grant a motion for summary judgment in a FOIA case based on the agency's declaration. *Cf. Emuwa,* 113 F.4th at 1017 (basing its ruling as to foreseeable harm on the declaration of the agency's FOIA officer).

[89] *See* R. Doc. No. 25-1, at 1 ("In the course of my official duties, I am familiar with the records at issue in this case and with the searches and reviews conducted in response to Plaintiff's FOIA request.").

duties."[90] As plaintiffs explain: "If the ever-present risk that documents will be disclosed in ordinary government-contract litigation does not already chill internal government deliberations, then it is difficult to see how any incremental risk of disclosure under FOIA could impose such a chilling effect."[91]

Plaintiffs proceed to contend that availability of protective orders in the civil litigation context does not undermine their position with respect to foreseeable harm.[92] They make three arguments in support of that contention. "First, protective orders are generally issued at the discretion of the presiding judge, so there is no guarantee that a protective order will be entered to protect against disclosure to third parties of documents produced in discovery."[93] "Second, even if a protective order shields a document from further disclosure during discovery, the document presumptively will be treated as a public record if it is later used to support a summary judgment or other motion."[94] "Third, even if a document were placed under seal and thus protected from public view, the party that sued the government—and thus likely has a more intense interest in the document than the general public— would still have access to the document (absent an extraordinary, 'attorneys' eyes only' sealing order)."[95] According to plaintiffs, it is "difficult to imagine" how Navy personnel would be chilled by disclosure because,

---

[90] R. Doc. No. 26, at 5–7.
[91] *Id.*
[92] *See id.* at 8.
[93] *See id.*
[94] *See id.*
[95] *See id.* (internal citations omitted).

[s]uch [persons] would need to be sufficiently familiar with the law to know that discovery in ordinary civil litigation does not necessarily result in disclosure to the general public; would need to disregard the significant risk that documents disclosed in ordinary civil litigation will ultimately become public; and would need to care more about the document at issue being viewed by the general public than the party with sufficient interest to sue the government outside the context of FOIA.[96]

There is some caselaw to support plaintiffs' position. For example, in *Vanda Pharmaceuticals, Inc. v. Food and Drug Administration*, the U.S. District Court for the District of Columbia found that the U.S. Food and Drug Administration ("FDA") had not met its foreseeable harm burden with respect to documents that were regularly disclosed to the public. *See* No. 22-938, 2023 WL 2645714 (D.D.C. Mar. 27, 2023). It held that because the documents' authors did not know at the time that they drafted the material whether their work would be made public, the agency could not establish that the drafters "currently expect" their "written descriptions of their views and deliberations to be shielded from public view" such that FOIA release would chill those same deliberations. *Id.* at *4. According to that court, "[d]isclosure cannot chill deliberations if those deliberating do not reasonably expect their deliberations to remain private." *See id.*

However, unlike the drafters in *Vanda Pharmaceuticals*, the expectation of public disclosure of the Navy's documents is far more attenuated. First, in *Vanda Pharmaceuticals* the FDA was required by statute in certain instances—which, as that court noted, occurred over 90% of the time—to disclose the documents to the

---

[96] *Id.* at 9.

public. *See id.* at \*3. Expectation of release based on a high likelihood of statutorily mandated disclosure is far different from expectation based on the *possibility* that a presiding judge will decide to override the deliberative process privilege with respect to these documents. Additionally, the FDA in *Vanda Pharmaceuticals* had a history of disclosing similar documents *to the public. See id.* (describing instances that the FDA had disclosed documents like the ones issue, including, in some circumstances, "in response to a FOIA request"). Plaintiffs have provided no examples where the Navy has released similar deliberative records to the public such that it would be unreasonable for the drafters to expect their written deliberations would be kept from public view. And it is far too speculative to assert that the documents would become part of the public record based on a mere possibility that a party to civil litigation might "later use[] [them] to support a summary judgment or other motion," or that the drafting employees should have expected them to be used.[97] To be sure, even if it were a certainty that these documents would be placed into the public record, "an agency does not forfeit a FOIA exemption simply by releasing similar documents in other contexts." *Emuwa*, 113 F.4th at 1018.

The Navy has explained that its concern is the chilling effect that would result from public disclosure; as it pointed out in its reply brief, "Plaintiffs appear to lose sight that the requested material, once released [under FOIA], is deemed releasable to the entire public, not just Plaintiffs."[98] And as the court in *Juul Labs, Inc. v. Food*

---

[97] *See* R. Doc. No. 26, at 8.
[98] R. Doc. No. 23, at 6.

*and Drug Administration* contemplated when rejecting a similar argument: the fact that similar documents may be available to the public in a hypothetical civil litigation does not mean that release of these documents would not render the Navy's ongoing deliberative processes considerably harder. *Cf.* 731 F. Supp. 3d at 77 (finding foreseeable harm was satisfied where the withheld documents were part of ongoing deliberations) ("The fact that the FDA was able to conduct [its deliberative process], even though certain underlying documents were released, does not mean that the review was not considerably harder or that the quality of the decision was not lessened because of the availability of those materials."). Notwithstanding any hypothetical litigation between the Navy and plaintiffs concerning whether the Navy's exercise of discretion was unreasonable in violation of the parties' agreements,[99] the Navy will continue to oversee the NONH project as well as its many other MHPI projects. Despite plaintiffs' speculative assertion otherwise, the foreseeable harm from public disclosure articulated by the Navy is not alleviated by the fact that a party with allegedly "more intense interest in the document[s]" would have access to them in civil litigation.

Plaintiffs have not given this Court reason to doubt McKelvey's declaration that release of these documents would chill candid discussions among Navy employees.[100] *Cf. Juul Labs, Inc.,* 731 F. Supp. 3d at 78 (rejecting the plaintiff's argument to undermine the agency's declaration of foreseeable harm that "the risk of

---

[99] *See* R. Doc. No. 26, at 7.
[100] *See* R. Doc. No. 25-1, at 2.

chilling future deliberations [was] not present [t]here because the withheld documents are of types that are routinely made available to the public" because the plaintiff had "provided no basis from which to conclude that the agency's discussion in its declaration . . . [was] inaccurate"). For this reason, and because the Navy has sufficiently "articulate[d] both the nature of the harm and the link between the specified harm and specific information contained in the material withheld," *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 106, the Court finds the Navy has met its foreseeable harm burden.

### 3.    Segregability

FOIA requires the government to release "[a]ny reasonably segregable portion of a record . . . after deletion of the portions which are exempt." 5 U.S.C. § 552(b). Therefore, "once an agency identifies a document that it believes qualifies for a FOIA exemption, it must undertake a segregability analysis, in which it separates the exempt from the non-exempt portions of the document, and produces the relevant non-exempt information." *Gahagan*, 147 F. Supp. 3d at 630 (citation modified); *see Texas Pub. Pol'y Found. v. Dep't of State*, 136 F.4th 554, 559 (5th Cir. 2025) ("When an enumerated exemption is implicated, an agency must still disclose '[a]ny reasonably segregable portion of a record . . . after deletion of the [exempt] portions.'" (quoting § 552(b)).

The requirement to determine segregability "extends to both steps of FOIA's sequential inquiry." *See Leopold v. Dep't of Just.*, 94 F.4th 33, 37 (D.C. Cir. 2024). Meaning, "[e]ven if an exemption covers an entire agency record, the agency still must

release any reasonably segregable information within the record that could be disclosed without causing reasonably foreseeable harm to an interest that the exemption protects." *See id.*

Plaintiffs allege that the withheld documents "likely contain segregable, nonexempt factual information that the Navy must disclose."[101] They direct the Court to a number of *Vaughn* index entries they predict will contain "purely factual" information and urge the Court to "first review the documents in camera and order the disclosure of reasonably segregable portions not protected by the deliberative process privilege."[102] The Court disagrees with plaintiffs' contention.

First, each of the entries identified by plaintiffs are emails described as containing "internal discussion" of the underlying financial analyses and factual information.[103] The deliberative process privilege protects factual information when it "reveal[s] the deliberative process." *See Batton*, 598 F.3d at 183; *see also Skelton v. U.S. Postal Serv.*, 678 F.2d 35, 39 (5th Cir. 1982) (noting that there is no rigid distinction for opinions based on fact) ("While the deleted material contained some assertions of fact, the deleted material was an evaluation of the facts based on the writer's own values. Disclosure of the deleted material would serve only to reveal the evaluative process by which a member of the decision-making chain arrived at his conclusions—and what those predecisional conclusions were. Such disclosure is precisely what Exemption 5 was intended to prevent."); *see also Emuwa*, 113 F.4th at

---

[101] R. Doc. No. 26, at 17.
[102] *See id.*
[103] *See Vaughn* index Documents 12, 16, 21, 69, 73, and 79.

1017 (finding the "discussion of source materials" could not be "safely segregated and released"); ("[D]iscussion of source material was part-and-parcel of the analysis, opinions, deliberations, and recommendations contained in the [a]ssessments and addressed in the declaration." (internal quotations omitted)).

Moreover, the record suggests that the Navy did undergo a segregability analysis before determining to withhold some of the documents in full. *See Emuwa*, 113 F.4th at 1017 (finding sufficient for purposes of segregability the agency's "confirm[ation] that her office reviewed the redactions to consider whether any information could be segregated and released without causing a foreseeable harm to the agency" (internal alterations omitted)). For example, the Declaration of Atina Hall explains that she, McKelvey, and agency counsel met to "determine which documents were responsive to [plaintiffs' FOIA request] and which documents *or portions thereof* were to be protected from release under FOIA exemptions."[104]

Consequently, the Court finds *in camera* review unnecessary to determine that the Navy properly conducted its segregability analysis of the withheld documents.

### 4.    *In Camera* Review

Both the Navy and plaintiffs remind the Court that it may review documents *in camera* rather than deny or grant summary judgment on the *Vaughn* index and McKelvey declaration alone.[105] To the extent that the parties request that the Court review *all* of the documents *in camera* before granting summary judgment, the Court

---

[104] *See* R. Doc. No. 20-2, at 4 (emphasis added).
[105] *See, e.g.* R. Doc. No. 25, at 2; R. Doc. No. 26, at 3.

declines to do so. *See Rollins v. U.S. Dep't of Just.*, 8 F.3d 21, 1993 WL 455891, at *1 (5th Cir. 1993) ("The district court may conduct an in camera review of the challenged documents but is not required to do so.").

The Court finds it unnecessary to review *in camera* those documents for which the Navy has satisfied its summary judgment burden of proof "through the submission of affidavits that identify the documents at issue and explain why they fall under the claimed exemption." *Atchafalaya Basinkeeper, Inc. v. U.S. Army Corps of Eng'rs*, No. 21-317, 2022 WL 219050, at *3 (E.D. La. Jan. 25, 2022) (Zainey, J.); *see also Juarez v. Dep't of Just.*, 518 F.3d 54, 60 (D.C. Cir. 2008) ("If a district court believes that in camera inspection is unnecessary to make a responsible de novo determination on the claims of exemption, it acts within its broad discretion by declining to conduct such a review." (quotation modified)).

## III.    CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that defendant's motion for summary judgment is **GRANTED.**

**IT IS FURTHER ORDERED** that plaintiff's complaint is **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, October 24, 2025.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**